[Cite as *Advanced Travel Nurses, L.L.C. v. Watson*, 2012-Ohio-3107.]

# IN THE COURT OF APPEALS OF OHIO
## SECOND APPELLATE DISTRICT
## MONTGOMERY   COUNTY

| | | |
|---|---|---|
| ADVANCED TRAVEL NURSES LLC, | : | |
| et al. | : | Appellate Case No. 24628 |
| | : | |
| Plaintiff-Appellees | : | Trial Court Case No. 08-CV-3695 |
| | : | |
| v. | : | |
| | : | (Civil Appeal from |
| ANTHONY WATSON, et al. | : | Common Pleas Court) |
| | : | |
| Defendant-Appellants | : | |
| | : | |

. . . . . . . . . . .

## O P I N I O N

Rendered on the 6th day of July, 2012.

. . . . . . . . . . .

LAWRENCE BUDENZ, 102 Elrod Court, Dayton, Ohio 45418
        Plaintiff-Appellee, *pro se*

LAWRENCE W. HENKE, II, Atty. Reg. #0008039, 371 West First Street, Suite 100, Dayton, Ohio 45402
        Attorney for Plaintiff-Appellee, Advanced Travel Nurses LLC

CHERYL R. WASHINGTON, Atty. Reg. #0038012, 130 West Second Street, Suite 450, Dayton, Ohio 45402
        Attorney for Defendant-Appellant, Anthony Watson
            and Advanced Healthcare Staffing LLC

. . . . . . . . . . . . .

HALL, J.

{¶ 1}     Anthony Watson appeals from the trial court's entry of final judgment against

him following a bench trial on the appellees' complaint and on his counterclaims.

{¶ 2}    Watson advances three assignments of error on appeal. First, he contends "the trial court's damage assessment was against the sufficiency and/or the manifest weight of the evidence." Second, he claims  "the trial court erred in awarding attorney costs and fees." Third, he asserts that "the trial court erred in failing to award appellant compensation on his counterclaims."

{¶ 3}    The present appeal stems from a business dispute involving appellant Anthony Watson, appellees Charles Dickerson and Lawrence Budenz, and their various business entities. The matter proceeded to a bench trial on a seven-count complaint filed by Dickerson, Budenz, and one of the entities, Advanced Travel Nurses, LLC, against Watson and three other entities, Advanced Healthcare Staffing, LLC, Advanced Care Services, LLC, and Advanced Payroll Funding, LLC. As part of the bench trial, the trial court also disposed of several counterclaims filed by Watson. After hearing days of testimony, the trial court found in favor of the plaintiff-appellees on their complaint. It also ruled against Watson on the counterclaims. The trial court awarded the appellees compensatory damages of $446,663.04 and punitive damages of $44,666.00. It also awarded the appellees attorney fees and costs totaling $80,174.78. This timely appeal followed.

{¶ 4}    The pertinent facts are set forth accurately and succinctly in the trial court's findings of fact and conclusions of law as follows:

Anthony Watson formed Advanced Healthcare Staffing, LLC ("AHCS") on November 21, 2006. Pl. Ex. 2. Watson formed Advanced Care Services, LLC ("ACS") on October 2, 2007. Pl. Ex. 3.Watson formed Advanced Travel Nurses LLC ("ATN") on February 14, 2008. Pl. Ex. 4, 24. On

March 28, 2007, Watson arranged for AHCS to enter into a Factoring and Security Agreement with Advance Payroll Funding, Ltd, a company (despite the similarity in name) unconnected to the entities created by Watson. Pl. Ex. 5.

The operations and finances of Watson's three companies were intermingled. For example, customer contracts for travel nurse services were placed in the name of AHCS, even after ATN was formed. The business of AHCS, however, was the per diem business, not the supply of travel nurses to hospitals. Kristy Greene worker (sic) for AHCS but was paid by ATN. ACS was involved in the Medicaid/Medicare business but it apparently never generated any revenue prior to Watson's departure. The companies and their affairs were treated more like departments of a single corporation than as separate and distinct corporate entities.

On March 24, 2008, Watson, ATN, AHCS, and ACS, entered into a written agreement with Charles E. Dickerson ("Dickerson") and Lawrence J. Budenz ("Budenz"). Pl. Ex. 8. The salient terms of the March 24, 2008 Agreement were:

1. Watson become the sole owner of AHCS and ACS.

2. 80% of ATN went to Dickerson and 20% went to Watson.

3. Dickerson took responsibility for certain credit card debt.

4. Income received from ATN would pass though the Advance Payroll factoring arrangement with AHCS through July 31, 2009.

5. All computers and software associated with travel nurses became the sole property of ATN.

6. Dickerson agreed to pay a bill owing to Midwest Design for computers totaling $3,300.91. There was no deadline in the agreement for this payment.

7. All travel nurse income became the sole property of ATN.

8. Watson agreed to not borrow additional money from Advance Payroll.

9. The Nursing Corp forms could continue to be used by ATN.

Dickerson had been the landlord to Watson and his companies. See Pl. Ex. 20A-20C. That relationship had evolved such that Dickerson had been providing substantial financial assistance to Watson and his companies. See Pl. Ex. 36. As part of that assistance, Dickerson had arranged for Budenz to assist in the financial oversight and management of Watson's companies. See Def. Ex. L (1/1/08 Agreement), RR. While Budenz had a criminal past involving financial improprieties, there is no credible evidence in the record that Budenz engaged in any financial improprieties involving the companies at issue. [footnote omitted].

Despite Dickerson's financial assistance to Watson's companies, they continued in steep financial decline. Dickerson and Budenz believed, however, that with improved financial oversight and management, the ATN business could prove to be quite profitable, once broadly established. The ATN business, however, required substantial up-front capital associated with the placement of travel nurses in distant locales. Watson's deteriorating financial position and Dickerson's and Budenz's view that the ATN business merited further investment led to the March 24, 2008 Agreement.

However, on April 11, 2008, Watson unilaterally declared Dickerson and Budenz to be in a material breach of the March 24, 2008 Agreement. Pl. Ex. 12; Def. Ex. C. Watson and others entered the companies' office suites that weekend and removed virtually everything, including but not limited to, files, data, information, and computers used in the operation of ATN. Watson testified that he believed that only materials relating to his solely owned entities, AHCS and ACS, were removed from the offices. The greater weight of the evidence, however, is that virtually everything was removed, including materials essential to the operation and viability of ATN.

In the aftermath of Watson removing the files, Budenz informed Watson that ATN was incurring and would continue to incur substantial damages. Pl. Ex. 13A, 13B, 13C. ATN had 10 travel nurses recruited and placement opportunities for them. With Watson's departure, ATN was left without even the names or contact information for those 10 travel nurses. None of the items or data removed by Watson was ever returned to ATN.

In the days between the March 24, 2008 Agreement and Watson's April 11, 2008 unilateral declaration of breach and April 12-13 removal of objects and data from the offices, Watson, on or about March 31, 2008, recklessly caused the health insurance coverage of ATN's travel nurses to be cancelled, causing disruption and harm to ATN's operations. Further, certain funds that would have been directed to the benefit of ATN (and applied towards repayment of funds loaned or advanced by Dickerson and Budenz) were re-directed to the benefit of Watson and/or Watson's solely owned entities. See

Pl. Ex. 36. [footnote omitted]

Following Watson's declaration of breach, additional funds to be paid by various entities for the benefit of ATN also were re-routed or re-directed to the benefit of Watson and/or Watson's solely owned entities. See Pl.Ex.36. Watson contends that ATN, Dickerson and Budenz wrongfully kept possession of and used certain copyrighted forms licensed to Watson by Nursing Corp. See Def. Ex. E, CC, DD. However, the Court finds that ATN and its employees did not use the Nursing Corp. forms, but even if they did, Watson incurred no damages as a result of that usage. Nursing Corp never brought suit over the forms.

Watson also argues that he was frozen out of the financial affairs of his companies, and left with virtually no information about their financial status. The Court finds, however, that via periodic meetings with Budenz, data provided weekly to Watson by Advanced Payroll, and other data shared with Watson by Budenz, that Watson was not excluded from the business operations and financial data was reasonably available to him. See Def. Ex. S.

Following Watson's removal of data and property from the office suites, ATN changed its name to Alternative Travel Nurses and attempted to continue in business. Due to the business disruptions caused by Watson's removal of data and property, as well as the declining economy, Alternative Travel Nurses operated for a short time before folding in June 2009.

Watson alleges that Budenz forged his name on certain drafts at various financial accounts. The Court finds that these allegations are not credible and not supported by the documentary evidence.

Plaintiffs' Verified Complaint for Damages and Injunctive Relief, filed

April 18, 2008, asserts the following claims:

Count One Breach of Contract (including the implied duty of good faith and fair dealing)

Count Two Breach of Fiduciary Duty by Minority Shareholder

Count Three Tortious Interference with Business Relations

Count Four Conversion (for removing property from the office suites) (plus punitives)

Count Five Unjust Enrichment

Count Six Declaratory Judgment

Count Seven Injunctive Relief [footnote omitted]

Defendants Watson, AHCS and ACS assert counterclaims for fraud, breach of contract, tortious interference with contract and unjust enrichment. (Doc. #83 at 1-4).

{¶ 5}    Based on the foregoing findings of fact, the trial court reached the following conclusions of law:

Watson's status as a minority owner of ATN created a fiduciary responsibility between himself and Dickerson, and as between himself and ATN. Watson breached that fiduciary duty in a number of ways, most notably by removing things and data from the ATN offices during the weekend of April 12-13, 2008, which substantially impaired ATN's business operations and viability. Since the affairs of AHCS and ATN were so closely entwined and intermingled, Watson's fiduciary duty to ATN and Dickerson would not allow him to wipe the offices clean under the rationale that he was taking only AHCS

and ACS materials. The Court finds that, by a preponderance of the evidence, Plaintiffs have established that Watson's conduct in unilaterally but without legal justification declaring the March 24, 2008 Agreement in material breach and resorting to the self-help remedy of clearing out the offices breached the duty of good faith and fair dealing implicit in the Agreement, breached his fiduciary duty owed to ATN and Dickerson, and constituted a conversion of ATN's property and assets (including but not limited to the nurse files and contact information). *See* OJI CV625.01 (conversion).

The Court finds that the elements of tortious interference with business relations have been proven by the greater weight of the evidence by Plaintiffs. The cancellation of the health insurance certainly impaired ATN's relationship with the impacted nurses and, consequently, the hospitals where they were placed. The cancellation of the nurses' health insurance coverage by Watson was reckless, at best.

Additionally, when Watson took the nurse files and contact information from the office suites on April 12-13, 2008, the prospective business relationships between the nurses, the hospitals, and ATN were intentionally harmed leading directly and proximately to ATN suffering substantial compensatory damages. The proof does not establish any justification or privilege by Watson for this interference. *See* OJI CV 45301 (tortious interference with business relations).

The Court further finds that Watson was unjustly enriched insofar as Dickerson made substantial investment in ATN with the express and

reasonable expectation that he would be re-paid and later reap greater financial rewards. Additionally, Budenz personally contributed funds to the business entities in the reasonable expectation that he would receive reimbursement. Watson's conduct re-directed income such that funds that would have been available to re-pay Dickerson and Budenz were directed for other purposes. Moreover, Watson's conduct placed ATN in an untenable financial and business position.

The Court finds and concludes that Defendant's counterclaims have not been established by a preponderance of the evidence. Neither Dickerson nor Budenz made any material misrepresentation of fact, affirmatively or by omission, to Watson, upon which Watson justifiably relied. *See* OJI CV 449.03 (elements of fraud). Plaintiffs did not materially breach any contract with Defendants. While Watson complained that the bill owing to Midwest Design had not been paid by April 11, 2008, the Agreement provided no deadline for that repayment and the greater weight of evidence establishes that a reasonable arrangement for payment had been developed with that unpaid supplier. Plaintiffs were not unjustly enriched; to the contrary, Dickerson (and to a lesser extent Budenz) provided substantial capital to assist ATN but Watson drained cash from ATN to enrich either himself or his other companies, all of which were in dire financial distress.

The Court finds that compensatory damages should be awarded to Plaintiffs as set forth on Pl. Ex. 35 in the amount of $456,333.04, less $9,700.00 which was the amount of a check that St. John's Hospital sent to

Advanced Payroll, for a total of $446,663.04. ATN had 10 nurses ready to become placed with hospitals. While they had not been placed at the time of Watson's breach, their placement was substantially certain to occur. The Court finds that such damages are not speculative.

"An award of punitive damages may be appropriate on a claim for breach of fiduciary duty upon a showing of malice. Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm." *Blair v. McDonough*, 177 Ohio App. 3d 262, 2008-Ohio-3698, 894 N.E.2d 377. See also *Burn v. Prudential Sacs., Inc.,* 167 Ohio App. 3d 809, 2006-Ohio-3550, 857 N.E.2d 621; *Schaefer v. RMS Realty* (2000), 138 Ohio App. 3d 244, 741 N.E.2d 155. Punitive damages also may be awarded for intentional interference with business relations, under the same standard.

The Court finds and concludes that Watson's actions exhibited a conscious disregard for the rights and interests of Plaintiffs that had a great probability of causing substantial harm. Hence, the Court awards punitive damages in the amount of 10% of the compensatory damages, that is, in the amount of $44,666.00. Additionally, the Court awards Plaintiffs their attorney fees and costs incurred in the action in an amount [of $80,174.78].

(*Id*. at 4-6).

{¶ 6} Watson raises three assignments of error on appeal: (1) "the trial court's

damage assessment was against the sufficiency and/or the manifest weight of the evidence";
(2) "the trial court erred in awarding attorney costs and fees"; and (3) "the trial court erred in
failing to award appellant compensation on his counterclaims."[1]

{¶ 7}    Upon review, we quickly may dispose of the second and third assignments of
error, which are without merit. With regard to attorney fees and costs, Watson asserts, in
conclusory fashion, that attorney fees generally are not awarded unless the losing party has
acted "in bad faith, vexatiously, wantonly, obdurately, or for oppressive reasons." (Appellant's
brief at 16).

{¶ 8}    In the present case, however, the trial court awarded Budenz and Dickerson
punitive damages in connection with their claims for breach of fiduciary duty and intentional
interference with business relations. (Doc. #83 at 6). This award of punitive damages
permitted an award of attorney fees. *See*, *e.g.*, *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d
552, 558, 1994-Ohio-461, 644 N.E.2d 397 (recognizing that "attorney fees may be awarded as
an element of compensatory damages where the jury finds that punitive damages are
warranted"). The second assignment of error is overruled.

{¶ 9}    The third assignment of error is equally unpersuasive. The counterclaims at

---

[1]In his reply brief, Watson urges us to strike appellee Budenz's pro se appellate brief for failure to provide adequate citations to the record. Despite the lack of certain citations, and in the exercise of our discretion, we decline to strike the brief. We also reject the suggestion, implicit in Watson's reply brief, that he is entitled to prevail on appeal because Budenz neglected to cite the trial transcript. Watson notes that an appellate court may disregard *an appellant's* assignment of error for failure to cite the portions of the record supporting the assigned error. In the present case, however, Budenz does not raise any assignments of error. He simply defends the judgment entered below. Watson is not entitled to prevail on appeal simply because Budenz's brief may be deficient. In an analogous context, this court has recognized that a party is not entitled to summary judgment simply because his opponent has failed to file a responsive brief. (*Lenco Corp. v. Schear's Metro Markets, Inc.*, 2d Dist. Montgomery No. 13580, 1993 WL 211333 (June 16, 1993)). A("Metro was not automatically entitled to summary judgment merely because Lenco failed to respond to the summary judgment motion. Rather, Metro was entitled to summary judgment only if after construing the evidence in Lenco's favor, reasonable minds could only come to one conclusion which was adverse to Lenco.").

issue involved the appellees' alleged failure to pay a bill owed to a company named Midwest Design and the appellees' alleged unauthorized use of forms provided by a company named Nursing Corp. With regard to the bill, the trial court found that there was no set deadline for payment and that the appellees had reached a payment agreement satisfactory to Midwest Design. (Doc. # 83 at 5). As for the forms, the trial court found that the appellees did not use the forms and, even if they did, Watson suffered no harm because Nursing Corp never brought suit over the forms. (*Id*. at 3). The record supports the trial court's findings on these issues. The third assignment of error is overruled.

{¶ 10}  The first assignment of error requires a more detailed analysis. Watson raises five damages-related arguments. He asserts that the trial court erred by: (1) finding damages not speculative; (2) finding Dickerson entitled to recover an initial $50,000 investment he made; (3) awarding damages for unjust enrichment; (4) not finding a failure to mitigate damages; and (5) awarding the appellees punitive damages.

{¶ 11}  The argument about damages being too speculative concerns the 10 travel nurses who Advanced Travel Nurses (ATN)  was in the process of placing with hospitals on initial 13-week contracts when Watson removed the files, computers, and other items from the offices. The trial court awarded the appellees $234,000 in lost profits as a result of ATN's inability to place the nurses after Watson removed the files and irreparably disrupted the business. Watson contends these lost profits were too speculative because ATN was relatively new, had not yet been profitable, had little money, and had no assurance that the nurses would be placed. He notes, among other things, that they had not yet been interviewed by the hospitals, drug tested, or background checked. Watson also argues that the new nurses may not have been profitable, even if they had been hired, and that they may not have remained

employed very long.

**{¶ 12}** We review a trial court's damages determination, including its determination as to whether claimed damages are too speculative, for an abuse of discretion. *Roberts v. United States Fid. & Guar. Co.*, 75 Ohio St.3d 630, 634, 665 N.E.2d 664 (1996); *see also Noyes v. Noyes*, 2d Dist. Montgomery No. 14008, 1994 WL 102101 (March 30, 1994).

**{¶ 13}** As set forth above, Watson formed his travel-nurse business, ATN, in February 2008. He then entered into a business relationship with Budenz and Dickerson in March 2008. Watson removed the crucial files and data from ATN's offices in April 2008. By that time, approximately 10 travel nurses were working for the company. Six of them quit upon discovering that Watson had cancelled their health insurance before removing ATN's files. (Trial transcript at 245, 247, 294-295). With the income generated from those 10 nurses before they quit, ATN was approaching profitability if not already marginally profitable. (*Id*. at 278, 302, 851-853, 1829).

**{¶ 14}** To establish lost profits, Budenz and Dickerson relied largely on evidence that 10 more travel nurses were in the process of being hired and placed at hospitals when Watson removed ATN's files. Based on their experience with the nurses who had been working for them, Budenz and Dickerson estimated a 25 percent gross profit on all revenue generated by the additional nurses. (*Id*. at 846, 1829). In light of the fact that ATN successfully had placed all prior travel-nurse applicants, Budenz anticipated that all of the new nurses would be placed. (*Id*. at 279). Budenz also explained, in some detail, how he and Dickerson had calculated the lost profits attributable to Watson's actions. (*Id*. at 300-302). On direct examination, Budenz engaged in the following discussion with his attorney:

Q. * * * Let's go to, if we can for a second, focus on loss of revenue

from the ten nurses that could not be placed when Mr. Watson took everything from the offices on the weekend of 4/11 to 4/13 '08. And I believe you can probably reference Plaintiff's Exhibit 16 as a guide or as a help perhaps. I believe you testified earlier that the expected gross profit there was somewhere in the range of I think $30,000 was it a month or–

A. I had testified that on the e-mails from Mr. Watson that I had sent to him–

Q. Right.

A. –that I identified that since we got about $30,000 gross billings over a thirteen-week period from each nurse that the anticipated gross revenues would be $300,000.

Q. Okay. Let's put that in perspective. How many times, within a reasonable probability, would you expect the nurses after you place them the first time would re-sign with you?

A. The IRS permits 39 weeks of temporary work a year to qualify for the tax-free lodging and meals and incidentals. So, it was common for a nurse to extend beyond the first 13-week period if they like the hospital. So the probability would have exceeded 80 percent. You would anticipate four of every five nurses extending–

Q. For how long?

A. For two more 13-week periods.

Q. Which equals the 39–

A. Which equals the 39 that the IRS allows, yes.

Q. Okay. Using that benchmark or that as a factoring device, can you tell us how much gross profit then based upon a 39-week basis the company lost from not placing these ten new nurses.

A. Well, if we take the $300,000 which would have been the first 13-week period, and use an 80 percent factor, that would be $240,000 for the second period, and $240[,000] for the third period. So, that would be $480,000 for the two extended periods plus $300,000 for the original period. And 240, 240 and 300,000 would be $780,000. And 25 percent of that for almost $200,000 would have been the actual profit lost from those nurses not working for the company.

Q. So within a reasonable probability expected a net profit of 25 percent off of the $780,000?

A. That's what is shown on the budget at Exhibit 16 that you referred to is that we anticipated a gross profit of 25 percent because the average direct cost is 75 percent. And since we had just met all of our other operating expenses, all of this other [income] would have gone toward profit. All this other incoming—all of this other money from these other ten nurses and any other nurses that we could have hired would have all gone towards profit.

Q. Because all of your operating expenses and payroll had been paid?

A. They're all paid for. And any of the direct expenses like the insurance and payroll taxes are budgeted in that 75 percent.

(*Id*. at 300-302).

{¶ 15}  The test for recovery of lost profits is found in *Charles R. Combs Trucking,*

*Inc. v. Internatl. Harvester Co.*, 12 Ohio St.3d 241, 466 N.E.2d 883 (1984), at paragraph two of the syllabus: "'Lost profits may be recovered by the plaintiff in a breach of contract action if: (1) profits were within the contemplation of the parties at the time the contract was made, (2) the loss of profits is the probable result of the breach of contract, and (3) the profits are not remote and speculative and may be shown with reasonable certainty.'" *AGF, Inc. v. Great Lakes Heat Treating Co.*, 51 Ohio St.3d 177, 181, 555 N.E.2d 634, 638 (1990) (quoting *Combs*). "In order for a plaintiff to recover lost profits in a breach of contract action, the amounts of lost profits, as well as their existence, must be demonstrated with reasonable certainty." *Gahanna v. Eastgate Properties, Inc*., 36 Ohio St.3d 65, 521 N.E.2d 814 (1988), syllabus.

**{¶ 16}** The Ohio Supreme Court has recognized that "'[t]he difficulty of proving lost profits varies greatly with the nature of the transaction.'" (Citation omitted). *AGF* at 181. "'If the breach prevents the injured party from carrying on a well-established business, the resulting loss of profits can often be proved with sufficient certainty. Evidence of past performance will form the basis for a reasonable prediction as to the future. * * * However, if the business is a new one or if it is a speculative one that is subject to great fluctuations in volume, costs or prices, proof will be more difficult. Nevertheless, damages may be established with reasonable certainty with the aid of expert testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and the like.'" *Id.*

**{¶ 17}** In *AGF*, the Ohio Supreme Court opined that "a new business may recover lost profits in a breach of contract action but such lost profits must be established with reasonable certainty." *Id.* at 183. The *AGF* majority further held that "a new business may establish lost profits with reasonable certainty through the use of such evidence as expert

testimony, economic and financial data, market surveys and analyses, business records of similar enterprises, and any other relevant facts." *Id.* at 183-184.

{¶ 18} On appeal, Watson criticizes Budenz and Dickerson for lacking the foregoing types of evidence. Having reviewed the record, we are unpersuaded that a lack of such evidence was fatal to the appellees' recovery of lost-profit damages. The Ohio Supreme Court noted in *AGF* that the difficulty of proving lost profits varies greatly depending on the nature of the business. Despite ATN's relative newness, the company had a record of placing travel nurses with hospitals and receiving revenue for their work. Based on that experience, Budenz, an accountant, explained that ATN earned a 25 percent gross profit from the revenue generated by each travel nurse. Budenz further testified that ATN was able to cover its operating expenses by April 2008 when it employed 10 travel nurses. According to Budenz, the gross profit generated from the 10 additional travel nurses who were in the process of being employed would have flowed directly to the company's bottom line as net profit. These calculations, which Budenz explained in his testimony and which were supported by written exhibits, were relatively uncomplicated and did not require "economic and financial data, market surveys and analyses, [or] business records of similar enterprises."

{¶ 19} As the Ohio Supreme Court recognized in *AGF*, in certain cases "past performance will form the basis for a reasonable prediction as to the future." *Id.* at 181. The trial court reasonably could have found this to be one of those cases despite ATN's relative youth. ATN had been operating long enough for Budenz to know the hourly rate the company charged hospitals for travel-nurse services, the profit margin for each travel nurse employed, and the company's monthly operating expenses. These figures enabled Budenz to project near-term future profits with reasonable certainty. Significantly, the appellees did not attempt

to project lost profits far into the future. ATN nurse recruiter Kristie Green opined that the company would have had more than 20 travel nurses and would have continued growing if Watson had not wrecked the business. (Trial transcript at 803-804). Nevertheless, the appellees sought lost profits for only the 10 travel nurses who were in the process of being employed and for only one 39-week cycle. (Plaintiff's Exhibit 35).

{¶ 20} Having determined that the lost profits for each travel nurse ATN was in the process of hiring were not speculative, the remaining question is whether the appellees established, with reasonable certainty, that the new nurses actually would have been placed if Watson had not removed virtually everything from the company's office. In resolving this issue, the trial court reasoned: "ATN had 10 nurses ready to become placed with hospitals. While they had not been placed at the time of Watson's breach, their placement was substantially certain to occur. The Court finds that such damages are not speculative." (Doc. #83 at 6).

{¶ 21} We see no abuse of discretion. Although the travel nurses whose files were taken had not yet been drug tested, interviewed by a particular hospital, or placed on site, Budenz testified that ATN successfully had placed all of its prior travel nurses. Similarly, ATN recruiter Kristie Green, who had significant experience in the travel-nurse industry, testified that she typically experienced an 80 to 90 percent placement rate once a nurse's name was placed on the "hot board." [2] (Trial transcript at 744-748). Green had a working relationship with a hospital association representing between 1,000 and 1,500 hospitals that used travel nurses. (Id. at 751). In light of this evidence, the trial court acted within its

---

[2] We note that the names of the 10 travel nurses at issue in this case had been placed on the board.

discretion in finding that the travel nurses at issue were "substantially certain" to be placed.

{¶ 22} Nevertheless, we have found a minor error in the trial court's damages computation that requires correction. The trial court awarded the appellees total compensatory damages of $456,333.04, as set forth in Plaintiff's Exhibit 35, minus the amount of a small check that had been received. (Doc. #83 at 6). The compensatory damages award included $234,000 in lost profits for the 10 travel nurses discussed above. This figure was based on all 10 nurses completing three 13-week contracts for a total term of 39 weeks each. (Pl. Exh. 35). The trial court then reduced this lost-profit figure, as well as other components of the lost-profit award, by 20 percent to account for Watson's 20 percent ownership interest in ATN.

{¶ 23} At trial, however, Budenz testified that in his experience travel nurses renewed their initial 13-week contract for two more13-week periods only 80 percent of the time. Therefore, he anticipated that only 8 of the 10 new nurses would have worked for ATN for a full 39 weeks. Using the figures in Plaintiff's Exhibit 35 and making this adjustment results in gross revenue of $312,000 to ATN for the first 13-week period, $249,600 for the second 13-week period, and $249,600 for the third 13-week period. Therefore, ATN's total lost revenue was $811,200 for the 10 nurses at issue. Applying the 25 percent profit margin set forth in Plaintiff's Exhibit 25 results in lost profits of $202,800 (not $234,000 as the trial court found) due to ATN's inability to employ the 10 new travel nurses. Using the $202,800 figure makes the damages owed to ATN $335,280 (not $366,480 as the trial court found).

{¶ 24} Deducting Watson's 20 percent ownership of ATN from the $335,280 figure results in damages to Dickerson (due to his 80 percent ownership of ATN) of $268,224 (not $293,184 as the trial court found). Adding this $268,224 to the other damages listed on

Plaintiff's Exhibit 35 results in total compensatory damages of $431,373.04 (not $456,333.04 as the trial court found). From its total-damages figure the trial court deducted $9,700 to account for a check that had been received. Deducting this $9,700 from total damages of $431,373.04 results in a final figure of $421,673.04. Accordingly, the trial court's judgment will be modified to reduce the total compensatory damages award to $421,673.04.

{¶ 25} The next two issues under Watson's first assignment of error concern whether Dickerson was entitled to recover, as damages, two $50,000 infusions of capital he made into ATN. Watson claims the first $50,000 was a speculative investment that did not need to be repaid. With regard to the second $50,000, Watson argues only that the trial court should have awarded those damages under contract law rather than under a theory of unjust enrichment.

{¶ 26} Upon review, we find no merit in either argument. Dickerson testified that he first made a $50,000 line of credit available to ATN at a time when Watson and Budenz were running the company together. (Trial transcript at 64-72). He explained as follows: "For the first $50,000 to be available for them to use for business purposes, a deal was struck where Mr. Budenz would own 25 percent and Mr. Watson would own 75 percent and I'd own nothing. It was just making a loan." (*Id*. at 72, 75). In light of this testimony, we reject Watson's argument that the initial $50,000 was not a loan and that it did not need to be repaid.

{¶ 27} The record reflects that Dickerson made the second $50,000 infusion of capital in exchange for a controlling ownership interest in ATN. (*Id.* at 76). In its ruling, the trial court found Dickerson entitled to recover this money, and other damages, as a result of Watson's actions. In support, the trial court reasoned: "The Court further finds that Watson was unjustly enriched insofar as Dickerson made substantial investment in ATN with the express and reasonable expectation that he would be re-paid and later reap greater financial

rewards. Additionally, Budenz personally contributed funds to the business entities in the reasonable expectation that he would receive reimbursement. Watson's conduct re-directed income such that funds that would have been available to re-pay Dickerson and Budenz were directed for other purposes. Moreover, Watson's conduct placed ATN in an untenable financial and business position." (Doc. #83 at 5).

{¶ 28} Although Watson quibbles with the trial court's reliance on unjust enrichment rather than traditional contract law, the outcome is the same under either theory. *See Gevedon v. Gevedon*, 167 Ohio App.3d 1, 2006-Ohio-2668, 853 N.E.2d 718 (2d Dist.) (recognizing that breach of contract and unjust enrichment can serve as alternative theories to recover the same damages). The essence of the trial court's ruling was that Watson's actions destroyed ATN's viability and caused significant financial loss for Dickerson. The trial testimony supports this conclusion. Therefore, the trial court did not err in finding Dickerson entitled to recover the money he lost as a result of Watson's actions. Because the trial court awarded Dickerson the money only once, it matters not whether the trial court applied traditional contract or unjust enrichment law.

{¶ 29} The next issue under Watson's first assignment of error is whether the appellees failed to mitigate their damages. Watson notes that the appellees created "Alternative Travel Nurses" after he removed the files and computers from ATN's offices. According to Watson, the appellees then leased Alternative Travel Nurses two offices that previously had been leased by Watson for another one of his companies, Advanced Healthcare Staffing. Watson contends the appellees neglected to collect any rent from Alternative Travel Nurses, thereby failing to mitigate the damages caused by his non-payment of rent from March through July 2008. (See Plaintiff's Exhibits 20(A), 20(B), and 20(C)). Finally, Watson

contends the appellees failed to mitigate damages by not attempting to finish placing the 10 travel nurses who were in the process of being hired when he removed ATN's files and equipment.

{¶ 30} Both arguments lack merit. Budenz testified that Watson had leased several offices from Dickerson on behalf of Advanced Healthcare Staffing. According to Budenz, Dickerson also gave Watson free use of one area, a former conference room identified as "Office 1" on Plaintiff's Exhibit 20(C). Budenz testified that Alternative Travel Nurses occupied this room after ATN's demise. Because Watson had not been charged for using Office 1, and Alternative Travel Nurses paid no rent for it, Budenz explained that Watson's unpaid rent obligation was not reduced to account for Alternative Travel Nurses' use of the space. (Trial transcript at 305-308). As for the other areas that had been leased by Watson, Budenz testified that Dickerson unsuccessfully tried to re-lease them. (*Id*. at 308). For his part, Dickerson believed that Alternative Travel Nurses had leased two rooms that formerly had been used by Watson. (*Id*. at 40-43). He was unable to produce a lease, however, or recall the dollar amount of the new lease.  (*Id*. at 95-96). He agreed, however, that Alternative Travel Nurses never paid rent. (*Id*.).

{¶ 31} In light of the foregoing evidence, the trial court did not err in awarding Dickerson the unpaid rent owed by Watson. The total amount owed was $12,778.58. (Plaintiff's Exhibit 20(B)). Budenz's testimony supports a finding that Dickerson unsuccessfully tried to re-lease the office space at issue and, therefore, attempted to mitigate his damages. Budenz's testimony also supports a finding that Alternative Travel Nurses moved into one office that Watson previously had used without charge. Even if Alternative Travel Nurses also occupied one other office without paying for a short time, as Dickerson

believed, any resulting reduction in Watson's total unpaid-rent obligation would be minimal.

{¶ 32} With regard to the second mitigation issue, the evidence supports a finding that Watson's actions made placement of the 10 additional travel nurses virtually impossible. In addition to removing all documents and contact information, Watson tarnished the appellees' reputation in the industry, making it unlikely that any hospitals or nurses would conduct business with Budenz and Dickerson. Therefore, the trial court did not err in rejecting a failure-to-mitigate argument based on Alternative Travel Nurses' failure to place the 10 travel nurses who were in the process of being hired when Watson emptied ATN's offices.

{¶ 33} Watson's final argument under his first assignment of error concerns the trial court's imposition of punitive damages. The evidences supports a finding that Watson acted with malice when he cancelled the travel nurses' health insurance and, later, when he removed the files and equipment from ATN's offices, thereby destroying the appellees' ability to conduct business. Although Watson attributes his actions to mistakes or negligence, the trial court acted within its discretion, as trier of fact, in finding otherwise. Therefore, the trial court correctly found that punitive damages could be awarded based on the appellees' successful claim for breach of fiduciary duty and a finding of malice. *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 302, 741 N.E.2d 155 (2d Dist.2000).

{¶ 34} We also reject Watson's argument that the trial court imposed grossly excessive punitive damages. The trial court awarded punitive damages equal to 10 percent of its compensatory damages award. (Doc. #83 at 6). Watson asserts, however, that "a huge disparity" exists between the actual harm suffered by the appellees and the punitive damages awarded. We disagree. The trial court awarded punitive damages equaling just *one-tenth* of the compensatory damages. This court has upheld, as not unconstitutionally excessive, a punitive

damages award nearly eight times larger than the actual damages. *Id.* at ¶ 124-125. We see nothing excessive about the award in this case. Moreover, the trial court reasonably could have found its punitive damages award necessary to achieve the legitimate goals of punishment and deterrence. *Id.* at ¶ 118.

**{¶ 35}** We held above, however, that the trial court's total compensatory damages award must be reduced from $446,663.04 to $421,673.04. Ten percent of the reduced compensatory damages award is $42,167.30. Therefore, the trial court's $44,666.00 punitive damages award will be reduced to $42,167.30.

**{¶ 36}** Watson's first assignment of error is sustained in part and overruled in part. It is sustained to the extent that we have found him entitled to the foregoing reductions. The trial court's judgment is hereby modified to reflect a compensatory damages award against Watson in the amount of $421,673.04 and a punitive damages award against him in the amount of $42,167.30. The remainder of the judgment remains undisturbed. As so modified, the judgment of the Montgomery County Common Pleas Court is affirmed.

. . . . . . . . . . . . .

DONOVAN and FROELICH, JJ., concur.

Copies mailed to:

Lawrence Budenz
Lawrence Henke
Cheryl Washington
Hon. Mary L. Wiseman