[Cite as *Caruso v. Leneghan*, 2014-Ohio-1824.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 99582**

## ANGELA CARUSO

PLAINTIFF-APPELLEE/
CROSS-APPELLANT

vs.

## DAVID M. LENEGHAN, ET AL.

DEFENDANTS-APPELLANTS/
CROSS-APPELLEES

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case Nos. CV-01-448754, CV-02-484716, and CV-05-556678

**BEFORE:** Celebrezze, J., Boyle, A.J., and E.T. Gallagher, J.

**RELEASED AND JOURNALIZED:** May 1, 2014

**ATTORNEYS FOR APPELLANTS**

Patrick P. Leneghan, Jr.
Leneghan & Leneghan
9500 Maywood Avenue
Cleveland, Ohio   44102

K. Scott Carter
200 Treeworth Boulevard
Suite 200
Broadview Heights, Ohio   44147


**ATTORNEY FOR APPELLEE**

William T. Wuliger
The Brownell Building
1340 Sumner Court
Cleveland, Ohio   44115

FRANK D. CELEBREZZE, JR., J.:

{¶1} Appellants/cross-appellees, Patrick Leneghan Sr. ("Patrick Sr.") and Ballycroy-Mayo International Ltd. ("Ballycroy"), allege 14 assignments of error resulting from the third portion of a trifurcated trial.[1] Appellee/cross-appellant, Angela Caruso ("Angela"), assigns seven errors from this and other portions of the trial. After a thorough review of the record and case law, we affirm.

## I. Factual and Procedural History

{¶2} In the 1980s, Angela and her then-husband, Michael Caruso, started a coffee roasting business that would become Berardi's Fresh Roast, Inc. ("BFR"). This business grew out of Angela's home and kitchen goods store. In 2000, as part of their divorce proceedings, the domestic relations court ordered that Angela buy out Michael's share of the company.

{¶3} Angela's attorney at the time, David Leneghan, brokered a deal between his father, Patrick Sr., and Angela. The details of this transaction are disputed. Angela claims that the transaction was a loan to be repaid at 12-percent interest. The documents, however, indicate a substantial loan and sale of a controlling interest in the company to Ballycroy, a company owned and controlled by Patrick Sr. As part of this transaction, Patrick Sr. also became a 100-percent owner of Caruso Properties, L.L.C., a company that owned the building and land used by BFR. With such a disparity in expectations,

---

[1] One of these assigned errors relates to the first trial.

disputes soon arose that caused Angela to either leave the company or be locked out by Patrick Sr., depending on whose testimony one believes.

{¶4} In any event, on September 17, 2001, Angela filed the first of four complaints against her divorce attorney, David Leneghan, and his law firm. In these various consolidated complaints, she also alleged causes of action against Patrick Sr., Patrick Leneghan Jr., BFR, Ballycroy, and a number of other corporate defendants. The trial court initially bifurcated the proceedings.

{¶5} The first trial began in 2005, where Angela's claims of attorney malpractice against David Leneghan and his law firm resulted in a $6,400,000 judgment in her favor. Ultimately, the insurance carrier for the firm settled the claim for an amount less than the judgment.[2]

{¶6} The second trial, which began on January 10, 2007, was to consist of claims of fraud and conspiracy against Patrick Sr., David Leneghan, and others, as well as a shareholder derivative action, a breach of fiduciary duty claim, and numerous other claims. However, during trial, the court found that issues integral to the shareholder action were impermissibly intermingling with claims of fraud. Therefore, the trial court again bifurcated the case. The shareholder derivative action would be the subject of a third trial along with claims for spoliation of evidence, breach of fiduciary duty, tortious

---

[2] The docket in this case indicates the settlement agreement is confidential, but key terms of that agreement were openly discussed by the defendants after the court granted their motion for an in camera view of the settlement agreement.

interference,[3] and breach of statutory duties. The second trial on issues of fraud and theft resulted in defense verdicts.

**{¶7}** On July 24, 2012, a three-week, two-part jury trial began. During the first phase, evidence was adduced about the failure of Patrick Sr. and other BFR employees and directors to turn over records to Angela, the minority shareholder. Evidence was also adduced regarding interested transactions that Patrick Sr. engaged in and the diversion of company assets and money for the personal benefit of certain family members and himself, to the detriment of the minority shareholder, that were improperly recorded in the records of BFR. At the close of evidence, the trial court ordered a directed verdict in the defense's favor on the spoliation claim. On August 14, 2012, the jury found in favor of Angela on the breach of statutory and fiduciary duty claims.[4] The jury also found that Patrick Sr. acted with malice. The jury awarded Angela $987,000 in compensatory damages.

**{¶8}** A second phase of this trial commenced so the jury could determine an appropriate amount of punitive damages. Because malice had already been found, the evidence was limited to appropriate damages. After the jury heard testimony from

---

[3] This claim was disposed of by summary judgment in favor of the defendants.

[4] The shareholder derivative claim was disposed of prior to judgment. The parties recognized that the nature of the claims were very similar to the breach of fiduciary duty claims and rather than have any damages flow back to Patrick Sr. as controlling member of BFR, any damages would be treated as stemming from the breach of fiduciary duty.

Patrick Sr. about his financial status as well as Angela's financial condition, the jury awarded one dollar in punitive damages.

**{¶9}** Another hearing was conducted where Angela presented evidence of appropriate attorney fees to the judge. The trial court did not award the full amount sought by Angela, but entered judgment for attorney fees totaling $690,968.80 in her favor. Angela also sought prejudgment interest, but the trial court denied this motion after a lengthy hearing. Patrick Sr. filed a motion for judgment notwithstanding the verdict and for a new trial. These were denied by the trial court, but a motion for remittitur was granted in part and agreed to by Angela. Ultimately, the judgment in favor of Angela against Patrick Sr. and Ballycroy totaled $1,681,930.07 and consisted of $958,776 in compensatory damages plus $27,674.27 in litigation costs, $690,968.80 in attorney fees, $4,510 in statutory damages, and $1 in punitive damages. Both sides appealed the case to this court assigning 21 errors between them.

## II. Law and Analysis

### a. One Satisfaction and Double Recovery

**{¶10}** In Patrick Sr.'s first two assignments of error, he argues that "[i]t was error to not dismiss based upon Ohio's one satisfaction rule," and "[i]t was error to fail to dismiss the case based upon Ohio's double recovery rule."

**{¶11}** "[B]ut one satisfaction can be exacted for the same demand." *Tanner v. Espey*, 128 Ohio St. 82, 192 N.E. 229 (Mar. 28, 1934). The Ohio Supreme Court set forth the nature of the one satisfaction rule in the context of master–servant liability.

*Natl. Union Fire Ins. Co. v. Wuerth*, 122 Ohio St.3d 594, 2009-Ohio-3601, 913 N.E.2d 939. There the court stated:

> "For the wrong of a servant acting within the scope of his authority, the plaintiff has a right of action against either the master or the servant, or against both, in separate actions, as a judgment against one is no bar to an action or judgment against the other until one judgment is satisfied." [*Losito v. Kruse*, 136 Ohio St. 183, 187, 24 N.E.2d 705 (1940)], citing *Maple v. Cincinnati, Hamilton & Dayton RR. Co.* (1883), 40 Ohio St. 313. *See also State ex rel. Flagg v. Bedford* (1966), 7 Ohio St.2d 45, 47-48, 36 O.O.2d 41, 218 N.E.2d 601 ("This court follows the rule that until the injured party receives full satisfaction, he may sue either the servant, who is primarily liable, or the master, who is secondarily liable, and a mere judgment obtained against the former is not a bar to an action or judgment against the latter"). "The plaintiff, in any event, can have but one satisfaction of his claim." *Losito*, 136 Ohio St. at 187-188, 16 O.O. 185, 24 N.E.2d 705.

*Id.* at ¶ 21.

{¶12} In the personal injury context, the Ohio Supreme Court set forth the same principle of allowing only one recovery for a given harm. *Seifert v. Burroughs*, 38 Ohio St.3d 108, 110, 526 N.E.2d 813 (1988). "The law of Ohio is well-settled that an injured party is entitled to only one satisfaction for his injuries, 'and that receipt of full

compensation from one of several persons whose concurrent acts of negligence are the basis of a suit for damages for personal injuries releases all.'" *Id.*, quoting *Royal Indemn. Co. v. Becker*, 122 Ohio St. 582, 589, 173 N.E. 194 (1930). The court also quoted from the Restatement of the Law 2d, Judgments, Section 50, Comment d (1982), which states:

> "* * * The adjudication of the amount of the loss also has the effect of establishing the limit of the injured party's entitlement to redress, whoever the obligor may be. This is because the determination of the amount of the loss resulting from actual litigation of the issue of damages results in the injured person's being precluded from relitigating the damages question. * * * Therefore, when a judgment is based on actual litigation of the measure of a loss, and the judgment is thereafter paid in full, the injured party has no enforceable claim against any other obligor who is responsible for the same loss."

*Seifert* at 110.

{¶13} As the *Seifert* court recognized, the question centers on the extent of the recovery and precisely what is included therein: "If for all injuries then the entry of satisfaction of judgment will have completely compensated him. On the other hand, if the judgment was for only a part of his injuries, then he was not fully compensated and is entitled to pursue his appeal." *Id*.

{¶14} However, Patrick Sr. was determined to be an intentional tortfeasor in the third trial. As a result, the collateral source rule, a narrow exception to the one satisfaction rule, is implicated here.

{¶15} First, "a joint tortfeasor who acted intentionally should be treated differently as to damages from one who was merely negligent." *Klosterman v. Fussner*, 99 Ohio

App.3d 534, 539, 651 N.E.2d 64 (2d Dist.1994). Further, where tortfeasors commit injury jointly,

> a plaintiff usually is entitled to only one recovery for actual damages. Under the principles of joint and several liability, a plaintiff can take a judgment for the full amount of her damages against any one or all of the tortfeasors and can collect from any one or all of the tortfeasors up to the highest award of damages, but not more.

*Id.* at 539.

> [T]he purpose of the collateral source rule is to assure that the tortfeasor does not benefit, by way of a reduced damage award, from payments that the plaintiff receives from an independent third party. Similarly, the legislature has provided that an intentional tortfeasor has no right of contribution from other tortfeasors who did not act intentionally. R.C. 2307.31(A) [now R.C. 2307.22]. The public policy reasons for R.C. 2307.31(A) and the collateral source rule are similar.[5]

*Id.* at 540. *See also Eysoldt v. Proscan Imaging*, 1st Dist. Hamilton No. C-110138, 2011-Ohio-6740, ¶ 8.

> **{¶16}** The court goes on further to reason:

> Although the [Ohio Supreme] court does not state this consequence explicitly, we conclude from the *Jones* decision [ *Jones v. VIP Dev. Co.*, 15 Ohio St.3d 90, 98, 472 N.E.2d 1046 (1984)] that the Supreme Court interpreted R.C. 2307.31 as providing a narrow legislative exception to the general rule that among joint tortfeasors the plaintiff is entitled to only one recovery. Under this exception, when a plaintiff recovers from or settles with a negligent tortfeasor and subsequently obtains a judgment against an intentional tortfeasor for the same injury, the plaintiff may recover more than the amount required to make him whole because the intentional tortfeasor is not entitled to any reduction in the award against him, regardless of the amount of the previous judgment or settlement.

---

[5] R.C. 2307.25(E) also includes breach of fiduciary duty in the class of tortfeasor claims not entitled to a right of contribution, even if the jury did not find that Patrick Sr. acted intentionally.

*Id.* *See also DWS Internatl. v. Meixia Arts & Handicrafts Co.*, S.D.Ohio No. C-3:09-cv-458, 2013 U.S. Dist. LEXIS 102128 (July 22, 2013). Patrick Sr. claims this rule only applies where a defendant settles prior to trial. According to him, where there is a judicial determination and settlement, this rule is not applicable. This is contrary to the *Klosterman* court's holding above. This rule, developed from equity principles, should not be defined with so arbitrary a line where there is no compelling justification for drafting it as such.

{¶17} Therefore, even if some damages overlap between the two trials, because Patrick Sr. was found to be an intentional tortfeasor, the one satisfaction rule does not apply to this case to prevent a judgment against him.

{¶18} Here, the trial court cut off the litigation in the first trial at the transaction date that transferred control of BFR to Patrick Sr., with certain damages projected into the future for loss of a controlling interest in BFR. The matter of punitive damages was also not litigated in the first trial, and therefore Angela's claims were not fully litigated. *See Clear Creek Partnership v. LeBeau*, 10th Dist. Franklin Nos. 97APE04-568 and 97APE04-569, 1998 Ohio App. LEXIS 1890, *12 (Apr. 28, 1998). In the third trial, the court limited damages to after the date of the transaction and included punitive damages.

{¶19} The injuries involved in the claims against Patrick Sr. in the breach of fiduciary duty claim are also inherently different from the malpractice action. The common law single satisfaction rule "does not apply unless there has been a determination of the settling defendant's liability for the same injuries as those caused by

the non-settling defendant." *BP Exploration & Oil Co. v. Maintenance Servs.*, 313 F.3d 936, 942 (6th Cir.2002), citing *In re Miamisburg Train Derailment Litigation*, 132 Ohio App.3d 571, 725 N.E.2d 738 (2d Dist.1999).

{¶20} Patrick Sr. relies heavily on *Seifert* for the proposition that the settlement barred all further claims after the first trial. However, the first sentence of *Seifert* indicates it applies to *concurrent* tortfeasors responsible for the same damages. *Seifert*, 38 Ohio St.3d at 110, 526 N.E.2d 813 (1988). Where evidence of additional damages that were not litigated and covered by the satisfaction are adduced, the rule does not act to bar further litigation. *Kingsmen Ents. v. Kasunic*, 8th Dist. Cuyahoga No. 72259, 1998 Ohio App. LEXIS 3391, *9 (July 23, 1998).

{¶21} The litigation that occurred in the third trial was not spawned as a direct result of the issues litigated in the first trial and did not cover the same injury. The first trial focused on the negligent representation of Angela by her divorce attorney, David Leneghan. The third trial resolved issues of breach of fiduciary duty by Patrick Sr. to the detriment of a minority shareholder. Apart from the fact that the defendants in the cases are related, the conduct does not combine to create an injury that stems from a common source. One does not naturally flow from the other. They are separate wrongs, committed separately against the same party. These injuries are divisible in both time and manner.

{¶22} Patrick Sr. also claims that a ruling contrary to his position would mean this court must overrule *Kingsmen*. Such a result is not required because *Kingsmen* is

distinguishable from the present case. That case dealt with concurrent tortfeasors committing the same acts that resulted in the same damages. In fact, that case dealt with the same torts committed by the same parties for the same damages. Homeowners and a home improvement contracting company sued each other for breach of contract. The homeowners also named several individuals who owned or controlled the home improvement company. Trial was bifurcated with litigation against the company proceeding first. Individual liability was to be litigated in a second trial. A judgment was rendered in favor of the company with an offsetting amount in favor of the homeowners. After the homeowners settled the matter as part of a bankruptcy proceeding filed by the company, a release was entered in settlement of the first judgment where the homeowners attempted to preserve their right to proceed against the individual defendants. *Kingsmen* at *2-4. The trial court granted the individual defendants' motion for summary judgment based, in part, on the one satisfaction rule. This court affirmed, holding, "[o]nce injuries are fully compensated, claims against others for those injuries are moot." *Id.* at *7, citing *Seifert*. But those injuries stemmed from the same acts. Here, we have injuries inflicted from separate acts of separate individuals over separate periods of time.

{¶23} The first trial resulted in a $6.4 million verdict in Angela's favor. She settled with the losing defendants in that trial for less than that amount with a reservation to seek redress from other non-settling defendants to fully satisfy her losses. This further indicates why recovery from the remaining defendants does not constitute a double

recovery, even if Patrick Sr.'s argument is correct, that there were no other damages offered in the third trial that were not covered in the first trial.

{¶24} R.C. 2307.28 and its predecessor, R.C. 2307.33, effected a change in the common law to give full effect to reservations of rights in settlement agreements against non-settling defendants. *Williams v. Fath Properties*, 1st Dist. Hamilton No. C-020834, 2003-Ohio-3200, ¶ 5 ("[T]he intent of the statute was to repudiate the common-law rule that a release of one tortfeasor resulted in the release of all claims against all other tortfeasors"); *Marcus v. Hamilton*, 8th Dist. Cuyahoga No. 81701, 2003-Ohio-2739. R.C. 2307.28 provides,

> When a release or a covenant not to sue or not to enforce judgment is given in good faith to one of two or more persons for the same injury or loss to person or property or the same wrongful death, both of the following apply:
>
> (A) The release or covenant does not discharge any of the other tortfeasors from liability for the injury, loss, or wrongful death unless its terms otherwise provide, but it reduces the claim against the other tortfeasors to the extent of the greater of any amount stipulated by the release or the covenant or the amount of the consideration paid for it, except that the reduction of the claim against the other tortfeasors shall not apply in any case in which the reduction results in the plaintiff recovering less than the total amount of the plaintiff's compensatory damages awarded by the trier of fact and except that in any case in which the reduction does not apply the plaintiff shall not recover more than the total amount of the plaintiff's compensatory damages awarded by the trier of fact.
>
> (B) The release or covenant discharges the person to whom it is given from all liability for contribution to any other tortfeasor.

{¶25} If Patrick Sr.'s argument that the damages from the first and third trials are the same is taken as true, the statute still abrogates the one satisfaction rule where the settlement reserves the right to pursue other non-settling defendants for uncompensated

amounts not covered by the settlement. Here, the amount of uncompensated damages from the first trial is not surpassed by the compensatory damages awarded in the third trial. The settlement agreement specifically reserved Angela's right to pursue claims against Patrick Sr. and did not specifically release anyone except David Leneghan and his employer. The argument raised by Patrick Sr. that this should only apply to pretrial settlements is contrary to the language of the statute where it specifically mentions agreements not to enforce judgments.

{¶26} The jury's verdict was for less than the amount of damages not covered by the settlement in the first trial. Therefore, there is no double recovery, and the one satisfaction rule is not applicable.

{¶27} Appellant's first and second assignments of error are overruled.

**b. "It was error to not consider [the] stock tendered after Trial 1."**

{¶28} In his third assignment of error, Patrick Sr. asserts that after Angela received a settlement in the first trial, that should have or constructively did mean that Angela tendered her stock. The settlement in the first case was between Angela, David Leneghan, and his employer law firm, and was paid by the insurer of the law firm. There is no allegation that the settlement agreement called for Angela to tender her shares. In fact, the settlement agreement preserved Angela's right to sue other entities involved in wrongdoing alleged in her complaints and amended complaints. To accept this argument, this court would be required to sustain the proposition that when a lawyer commits malfeasance against a client in a business transaction, the lawyer should be rewarded with the fruits of the transaction to offset the losses sustained in the malpractice action. This is untenable.

{¶29} Angela's retention of her shares was presumably part of a bargained-for exchange. She relinquished her right to a certain amount of her judgment, ostensibly so that she could keep her shares and pursue remedies against other non-settling defendants who separately wronged her. If Patrick Sr. wanted her shares tendered, that could have been included in the settlement agreement. It was not, and there is no reason to hold that her shares were tendered as a result of the settlement.

{¶30} Appellant's third assignment of error is overruled.

### c. Admissibility of Testimony

### 1. Expert Testimony on Rent

{¶31} Patrick Sr. claims in his fourth assignment of error that "[i]t was error to allow Plaintiff's expert's testimony on improper rent in Trial 3." During trial, the court excluded some of the expert's valuation findings and caused the testimony of the expert to change as a result. Patrick Sr. claims this was error.

{¶32} It is well established that, pursuant to Evid.R. 104, the introduction of evidence at trial falls within the sound discretion of the trial court. *State v. Heinish*, 50 Ohio St.3d 231, 553 N.E.2d 1026 (1990).

{¶33} This assignment of error involves the trial court's decision to limit or exclude evidence. The standard for such is well defined in Ohio. "The admission or exclusion of evidence rests within the sound discretion of the trial court." *State v. Jacks*, 63 Ohio App.3d 200, 207, 578 N.E.2d 512 (1989).

{¶34} Further, Evid.R. 702, which controls the admission of expert testimony during the course of trial, provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." The determination of whether a witness possesses the qualifications necessary to allow expert testimony lies within the sound discretion of the trial court. In addition, the qualification of an expert witness will not be reversed unless there is a clear showing of an abuse of

discretion on the part of the trial court. *State v. Maupin*, 42 Ohio St.2d 473, 330 N.E.2d 708 (1975); *State v. Minor*, 47 Ohio App.3d 22, 546 N.E.2d 1343 (10th Dist.1988).

**{¶35}** Here, Patrick Sr. questions the trial court's decision to allow Heinz Ickert's testimony at trial that was not contained in his expert report. This situation arose when it was learned that Ickert, an expert in business valuation, did his own inquiry into the fair market value of rent for the building housing BFR. However, Ickert did not have a demonstrated expertise in real estate matters. He admitted that during a limited voir dire. His testimony about fair market rent was then excluded by the trial court. As a result, Angela's counsel switched gears and had Ickert testify about the improper rents as the difference between two rental contracts where a later contract for less rent superseded the earlier one. These leases were in evidence, and a proper foundation was laid for this testimony. Later, based on the failure of the parties to attach a lease to the April 2000 agreement, Angela's attorney prompted Ickert to opine that any rent payments were improper given that there was no explicit requirement for BFR to pay rent.

**{¶36}** The issue of excessive rents was raised in Ickert's report. Further, a foundation was laid during his testimony that allowed him to opine that all the rental payments were excessive because there was no obligation for BFR to pay rent given that no lease was attached to the April 2000 documents where one was specifically contemplated. It was not an abuse of the trial court's discretion to allow this testimony. As the trial court stated in overruling the objection, the theory was incredible and may well cut against Ickert's assessment of damages in the eyes of the jury, but that was a

matter of the weight of the evidence, not its admissibility.   In fact, on cross-examination, Ickert admitted that he did not believe that BFR owed nothing for rent.

{¶37} Therefore, the testimony was admissible.   The credibility of the testimony is not for this court to weigh in terms of determining its admissibility.

{¶38} Appellant's fourth assignment of error is overruled.

### 2. Testimony of Financial Vulnerability

{¶39} In Angela's first cross-assignment of error, she claims that

> [t]he trial court committed reversible error in allowing appellants to introduce evidence of appellee's wealth, in failing to give a limiting instruction regarding the use of that evidence during the punitive damages phase of this litigation and in instructing the jury that the amount of punitive damages must be established with clear and convincing evidence, while neglecting to require appellants to produce necessary financial documents.

{¶40} The degree of reprehensibility is an important factor to be considered when assessing punitive damages.   *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575, 116 S.Ct. 1589, 134 L.Ed.2d 809 (1996).   The Supreme Court has set forth a number of factors that should be considered in judging the reprehensibility of certain conduct.  These include whether

> the harm caused was physical as opposed to economic; the tortious conduct evinced an indifference to or a reckless disregard of the health or safety of others; the target of the conduct had financial vulnerability; the conduct involved repeated actions or was an isolated incident; and the harm was the result of intentional malice, trickery, or deceit, or mere accident.

(Citations omitted.)   *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

{¶41} Here, Angela takes issue with the court's decision to allow Patrick Sr. to rebut testimony that Angela was financially vulnerable as a result of his actions. The court ruled that evidence of financial vulnerability, or lack thereof, was an issue pertinent to the award of punitive damages based on the holding in *Am. Chem. Soc. v. Leadscope*, 10th Dist. Franklin No. 08AP-1026, 2010-Ohio-2725. There, the Tenth District appropriately set forth the factors that should be examined when awarding punitive damages, including financial vulnerability. *Id*. at ¶ 75.

{¶42} The financial vulnerability of the victim is an issue that should enhance damages where it applies. However, punitive damages do not compensate for loss. They punish. Where the victim happens to be financially secure, this should not reduce the culpability or the liability of the tortfeasor for engaging in willfully damaging conduct. Financial vulnerability should be used as an enhancing factor, a sword for the destitute plaintiff, not a shield for the willful tortfeasor.

{¶43} However, courts have interpreted this factor to allow for the introduction of evidence regarding the victim's financial well-being to rebut claims of vulnerability at the time of alleged intentional conduct. *See, e.g., Morgan v. New York Life Ins. Co.*, 559 F.3d 425, 441-442 (6th Cir.2009).[6] There, addressing a somewhat similar argument to the present one, the Sixth Circuit did not indicate that any problem existed with the

---

[6] *See also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 434, 123 S.Ct. 1513, 155 L.Ed.2d 585 (2003).

introduction of the relative wealth of the victim leading up to the wrongful termination of his employment.

{¶44} Financial vulnerability is one of the main guideposts in determining an appropriate amount of punitive damages. Therefore, evidence of the absence of vulnerability can be considered when affirmative evidence of vulnerability is introduced.

{¶45} Here, if the matter focused only on the conduct of the parties in 2002 and 2003, then Angela may well be correct. However, many of the damaging acts she complained of in the third trial were from 2006 through 2012. She was not financially vulnerable during this time. She was financially vulnerable prior to receiving a settlement in 2006, and she presented testimony about this period of her life. She testified about her loss of income, her dependence on family and others for money, foreclosures, and her financial ruin.

{¶46} In this case, there is no single, discrete event around which the court may limit evidence of vulnerability as there is in other cases, such as employment discrimination. The acts that comprised malicious damaging conduct spanned a decade. Some of those acts occurred when Angela was financially vulnerable and others did not. The jury heard all this evidence. As such, Angela's argument that it was error to allow evidence of her lack of financial vulnerability during a portion of this pertinent time is overruled.

### d. Malice

**{¶47}** The jury found that Patrick Sr.'s actions demonstrated malice in dealings with Angela, the minority shareholder. In his fifth assignment of error, Patrick Sr. claims that "[i]t was error to not set aside the jury's finding of malice in Trial 3." The jury's finding is supported in the record.

> An award of punitive damages may be appropriate on a claim for breach of fiduciary duty upon a showing of malice. Actual malice, necessary for an award of punitive damages, is (1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.

*Blair v. McDonagh*, 177 Ohio App.3d 262, 2008-Ohio-3698, 894 N.E.2d 377 (1st Dist.). *See also Burn v. Prudential Secs., Inc.*, 167 Ohio App.3d 809, 2006-Ohio-3550, 857 N.E.2d 621 (3d Dist.); *Schafer v. RMS Realty*, 138 Ohio App.3d 244, 741 N.E.2d 155 (2d Dist.2000); R.C. 2315.21(C)(1). A plaintiff must clearly and convincingly establish that a defendant acted with malice. R.C. 2315.21(D)(4); *Rapport v. Kochovski*, 185 Ohio App.3d 309, 2009-Ohio-6880, 923 N.E.2d 1212, ¶ 45 (5th Dist.).

**{¶48}** Here, the jury's finding of malice is the proper conclusion drawn from the evidence. After filing suit against David Leneghan, there is evidence that Angela was locked out and excluded from any benefit from the company by Patrick Sr. His deposition testimony from March 18, 2011, as a representative of BFR, even demonstrates Patrick Sr.'s belief that he was the only shareholder of the company.[7]

---

[7] Patrick Sr.'s belief was premised on his assumption that Angela should have tendered her shares after receiving a settlement from the first trial, but there was no agreement as such and no judicial determination deciding such.

Further evidence demonstrates a systemic pattern of record keeping that would prevent a minority shareholder from learning the full extent of the benefits enjoyed by the majority shareholder and his family. Transactions involving family members and benefits received by Patrick Sr. were intentionally recorded in the financial documents of BFR to appear to be ordinary business expenses. Angela's expert, Heinz Ickert, testified that many of these transactions required affirmative actions to change the electronic records to reflect a payee different from the actual payee. The incalcitrant lack of disclosure is another instance that the jury could rely on to find malice. The allegations that Patrick Sr. and other defendants fabricated evidence, including BFR meeting minutes and notices to reflect actions and events that did not occur, is another.

{¶49} All of this caused substantial harm to Angela. She was rendered destitute by the actions of Patrick Sr. and his subordinates and excluded from the company she had spent two decades building.

{¶50} This evidence all supports a finding of ill will or revenge in interpreting actions taken by Patrick Sr. and his subordinates. Therefore, this fifth assignment of error is overruled.

### e. Attorney Fees

{¶51} Patrick Sr. next claims in his sixth assignment of error that "it was error to award an unreasonable amount of attorney fees in Trial 3."

{¶52} Where punitive damages are awarded, attorney fees may also be warranted. *Sivit v. Village Green of Beachwood*, 8th Dist. Cuyahoga No. 98401, 2013-Ohio-103, ¶

68, citing *Zoppo v. Homestead Ins. Co.*, 71 Ohio St.3d 552, 644 N.E.2d 397 (1994). The award of such fees are reviewed for an abuse of discretion. *Advanced Travel Nurses L.L.C. v. Watson*, 2d Dist. Montgomery No. 24628, 2012-Ohio-3107, ¶ 12. "'Reasonable fees' are to be calculated according to the prevailing market rates in the relevant community, taking into consideration the experience, skill, and reputation of the attorney." *Sivit* at ¶ 70, citing *Blum v. Stenson*, 465 U.S. 886, 895, 104 S.Ct. 1541, 79 L.Ed.2d 891 (1984). The burden of proof rests with the party seeking an award of attorney fees to establish a reasonable amount.

{¶53} At trial, Angela's attorney testified that, prior to 2010, he was unable to detail which activities performed on the various trials were solely related to the third trial, so he only included fees earned from 2010 forward where he could be certain the fees were earned in the present litigation. He then indicated specific hourly rates for his time ($350 per hour) and that of his various subordinates ($280 per hour for associates and $160 per hour for paralegals). Angela's attorney also provided evidence of acceptance of these hourly rates in other litigation he had engaged in. The attorney calculated a total cost of $1,198,732. Patrick Sr. was able to establish that Angela was not actually required to pay her attorney's claimed hourly rates because the engagement letter outlined a contingent fee agreement where her attorney would receive as much as 50 percent should the case go to trial and be appealed. The engagement letter was not produced for the court to consider.

**{¶54}** The trial court issued a thorough and well-reasoned opinion on this matter. There, it reduced the hourly rate claimed by Angela's attorneys to $300 per hour for lead counsel, $195 per hour for associate attorneys, and $95 per hour for paralegals. It then closely examined the 30-page itemized billing statement and reduced the reasonable hours expended by roughly 3500. The court then calculated reasonable attorney fees to be $690,968.80. The trial court complied with its duty to award reasonable attorney fees in this case. It calculated a lodestar figure. *See Sivit* at ¶ 70, quoting *Blanchard v. Bergeron*, 489 U.S. 87, 94, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ("multiplication of the 'number of hours reasonably expended on the litigation times a reasonable hourly rate'"). It then went through the factors outlined in Ohio Rules of Professional Conduct 1.5 to determine if a deviation from the lodestar figure would be appropriate. It noted that the litigation did not involve unique issues and that it was spread over numerous years, which did not prevent Angela's attorneys from engaging in other business. The court also noted that the fees were high in this case as a result of significant discovery violations precipitated by Patrick Sr.

**{¶55}** Based on this evidence, the trial court did not err in awarding $690,968.80 in attorney fees.

**{¶56}** Appellant's sixth assignment of error is overruled.

### f. "The conduct of Plaintiff's counsel and the jury unfairly prejudiced Defendants in Trial 3."

**{¶57}** "[T]he determination of whether the bounds of permissible argument have been exceeded is, in the first instance, a discretionary function to be performed by the trial

court. Therefore, the trial court's determination will not be reversed absent an abuse of discretion." (Citations omitted.) *Pesek v. Univ. Neurologists Assn.*, 87 Ohio St.3d 495, 501, 721 N.E.2d 1011 (2000). An abuse of discretion is indicated by a court's "failure to exercise sound, reasonable, and legal decision-making." *State v. Beechler*, 2d Dist. Clark No. 09-CA-54, 2010-Ohio-1900, ¶ 62. However, that discretion is not absolute. Where "gross and abusive conduct occurs, the trial court is *bound, sua sponte, to correct the prejudicial effect of counsel's misconduct.*" (Emphasis sic.) *Snyder v. Stanford*, 15 Ohio St.2d 31, 37, 238 N.E.2d 563 (1968).

{¶58} After a review of the transcript in this case, it cannot be said that counsel's conduct unfairly prejudiced appellants. Counsel did conduct himself, at times, in a disrespectful manner, but so did attorneys for Patrick Sr. and Ballycroy. The court had to warn Angela's attorney, William Wuliger, several times throughout the case to refrain from comments, eye-rolls, and quips. The only time gross misconduct occurred, Mr. Wuliger was sanctioned. During closing arguments Mr. Wuliger displayed to the jury some information on a comprehensive time line that was previously excluded by the trial court. The court gave an instruction to correct any prejudicial effect, and the improper information displayed was not so significant to the case that it would unfairly prejudice Patrick Sr. The jury is presumed to follow the proper instructions of the trial court. *State v. Ahmed*, 103 Ohio St.3d 27, 2004-Ohio-4190, 813 N.E.2d 637.

{¶59} If the jury was prejudiced against one side in this case, it was because of the actions of Patrick Sr. and others in engaging in a take-no-prisoners style of business to the

detriment of the opposing side. There is no evidence in the record that the minor improper actions of Mr. Wuliger prejudiced Patrick Sr. in this extensive trial.

{¶60} Patrick Sr. also complains that the jury was biased against him. Comments and actions of the jury do not, in any way, demonstrate an ill will toward either side or demonstrate ill will toward Patrick Sr. After sitting through a lengthy trial where it seemed almost every other objection caused both sides to plunge headlong into a dissertation on the vagaries of the trial judge's decisions in limine, one can hardly blame members of the jury for making comments that they would rather be doing something, anything, else.

{¶61} Simply put, this was a personal, emotional trial that culminated over a decade of acrimony. The attorneys involved, at times, did not conduct themselves with decorum and respect. However, the trial judge did an admirable job at controlling these emotions and ensuring a fair trial.

{¶62} Appellant's seventh assignment of error is overruled.

### g. "It was error to award judgment in Trial 3 contrary to the articles of incorporation."

{¶63} In his eighth assignment of error, Patrick Sr. argues that the articles of incorporation absolve him of liability for interested transactions.

{¶64} As a director and majority shareholder in a close corporation, Patrick Sr.'s conduct is governed by several important duties, including a duty of good faith, a duty of loyalty, a duty to refrain from self-dealing, and a duty of disclosure. R.C. 1701.59(B) and 1701.60(A)(1); *Wing Leasing, Inc. v. M & B Aviation, Inc.*, 44 Ohio App.3d 178,

181-182, 542 N.E.2d 671 (10th Dist.1988). "However, because close corporation directors are frequently the corporate stockholders as well, courts also tend to impose a stringent fiduciary standard on such directors." *Id.*, citing 1 O'Neal & Thompson, *O'Neal's Close Corp.*, Section 1.20, at 31-32 (3 Ed.Cum.Supp.1987) (collecting cases). Those duties may be abrogated somewhat by the articles of incorporation, but not entirely. Further, the articles must explicitly exclude some duties according to R.C. 1701.59(E):

> A director shall be liable in damages for any action that the director takes or fails to take as a director only if it is proved by clear and convincing evidence in a court of competent jurisdiction that the director's action or failure to act involved an act or omission undertaken with deliberate intent to cause injury to the corporation or undertaken with reckless disregard for the best interests of the corporation. Nothing contained in this division affects the liability of directors under section 1701.95 of the Revised Code or limits relief available under section 1701.60 of the Revised Code. This division does not apply if, and only to the extent that, at the time of a director's act or omission that is the subject of complaint, the articles or the regulations of the corporation state by specific reference to this division that the provisions of this division do not apply to the corporation.

{¶65} In compliance with these principles, BFR's articles of incorporation include a provision limiting a director's liability for *disclosed* interested transactions, but it does not reference R.C. 1701.59(E). The articles also allow for ratification of interested transactions. There is no evidence in the meeting minutes that Patrick Sr. disclosed any of the interested transactions to the board. Further, one of the board members testified they never voted on anything or held regular meetings in his roughly 4-year term. There is no evidence of ratification or disclosure. Therefore, the articles of incorporation do not protect Patrick Sr. in this case.

{¶66} Appellant's eighth assignment of error is overruled.

### h. Piercing the Corporate Veil

**{¶67}** Patrick Sr., next argues in his ninth assignment of error that "[i]t was error to find that Ballycroy is [Patrick Sr.'s] alter ego in Trial 3." During the end of the first part of the third trial, Angela moved for a directed verdict that Patrick Sr. was the alter ego of Ballycroy based on admissions made during trial. Because the majority shareholder of BFR was actually Ballycroy, the case was brought against it with allegations in the complaint that Patrick Sr. dominated and controlled Ballycroy in such a way that Ballycroy's corporate form should be ignored and Patrick Sr. be subjected to individual liability. The parties eventually reached an agreement where this was admitted, and Ballycroy was dismissed from the case. However, the judgment was still entered against Ballycroy jointly and severally, even though it was ostensibly no longer a party to the case. The nature of the stipulation explains this unusual occurrence.

**{¶68}** The journal entry documenting this stipulation and resultant dismissal states:

> The parties agree that the "veil" of limited liability available to shareholders of a corporation does not apply to tort-based claims such as breach of fiduciary duty. Therefore, [Ballycroy] is dismissed as a party with the understanding that defendant Patrick Leneghan, Sr. is the alter-ego of [Ballycroy].

**{¶69}** While the trial court dismissed Ballycroy as a party, it allowed its attorney to still argue before the court to preserve its rights in this case, given the nature of the stipulation and the fact that the corporate veil had been pierced.

**{¶70}** Ballycroy's status as a continuing defendant was cemented in the case when Angela filed an unopposed motion to hold Ballycroy jointly and severally liable. Neither

Ballycroy nor Patrick Sr. objected or opposed this motion.[8]   Therefore, they have waived

all but plain error.  To constitute plain error, the error must be obvious on the record,

palpable, and fundamental, so that it should have been apparent to the trial court without

objection.  *See State v. Tichon*, 102 Ohio App.3d 758, 767, 658 N.E.2d 16 (9th

Dist.1995).  Moreover, plain error does not exist unless the appellant establishes that the

outcome of the trial clearly would have been different but for the trial court's allegedly

improper actions.  *State v. Waddell*, 75 Ohio St.3d 163, 166, 661 N.E.2d 1043 (1996).

Notice of plain error is to be taken with utmost caution, under exceptional circumstances,

and only to prevent a manifest miscarriage of justice. *State v. Phillips*, 74 Ohio St.3d 72,

83, 656 N.E.2d 643 (1995).

{¶71} The dismissal involved in this error was not a true dismissal even though it

was labeled as such.  The parties recognized that Ballycroy and Patrick Sr. were one and

the same as a result of the stipulation.  However, the trial court did not truly dismiss

Ballycroy from the case.  The court allowed Ballycroy's attorney to continue to

participate in the proceedings because of the nature of the stipulation.  The attorney that

represented Ballycroy continued to address the court, make objections, and file motions

on behalf of Ballycroy.  Ballycroy would have no standing to do such things if it were

truly dismissed from the case. While the trial court classified its order as a dismissal of

Ballycroy, it was more in the nature of a directed verdict piercing the corporate veil.  As

---

[8] It must be noted that Ballycroy was still participating in the proceedings at the time this motion was made and received notice of the motion.

such, it was not plain error to enter judgment jointly and severally against Ballycroy and Patrick Sr. The trial court's order holding Ballycroy jointly and severally liable is not a manifest injustice in this case.

{¶72} Appellant's ninth assignment of error is overruled.

### i. Manifest Weight

{¶73} Patrick Sr. argues in his tenth assignment of error that "[t]he judgment in Trial 3 was against the manifest weight of the evidence." He asserts protection under the business judgment rule and attacks the evidence of damages adduced at trial.

{¶74} It is well established that when some competent, credible evidence exists to support the judgment rendered by the jury, an appellate court may not overturn that decision unless it is against the manifest weight of the evidence. *Seasons Coal Co., Inc. v. Cleveland*, 10 Ohio St.3d 77, 80, 461 N.E.2d 1273 (1984). The knowledge a finder of fact gains through observing the witnesses and the parties in any proceeding (i.e., observing their demeanor, gestures, and voice inflections, and using these observations in weighing the credibility of the proffered testimony) cannot be conveyed to a reviewing court by a printed record. *In re Satterwhite*, 8th Dist. Cuyahoga No. 77071, 2001 Ohio App. LEXIS 3722, *7 (Aug. 23, 2001), citing *Trickey v. Trickey*, 158 Ohio St. 9, 13, 106 N.E.2d 772 (1952). In this regard, the reviewing court in such proceedings should be guided by the presumption that the findings were indeed correct. *Seasons Coal Co., supra*. As the Supreme Court of Ohio has stated, "it is for the trial court to resolve

disputes of fact and weigh the testimony and credibility of the witnesses." *Bechtol v. Bechtol*, 49 Ohio St.3d 21, 23, 550 N.E.2d 178 (1990).

**{¶75}** "Minority shareholders have a cause of action against controlling shareholders for attempting to divert corporate profits to themselves at the expense of the minority." *Soulas v. Troy Donut Univ.*, 9 Ohio App.3d 339, 342, 460 N.E.2d 310 (10th Dist.1983), citing *Forbes v. Wilson*, 243 F. 264 (N.D.Ohio, 1917).

**{¶76}** Patrick Sr. first argues that the business judgment rule precludes a verdict in favor of Angela. The business judgment rule is founded on the proposition that courts are not in a position to second-guess the uninterested business decisions of directors and others made in good faith with reasonable care. *Stepak v. Schey*, 51 Ohio St.3d 8, 12, 553 N.E.2d 1072 (1990), fn. 3; R.C. 1701.59(B). However, even if it applied, "the business judgment rule is rebutted if there is evidence of disloyalty, including, for example, 'the motives of entrenchment, fraud upon the corporation or the board, abdication of directorial duty or the sale of one's vote.'" (Citations omitted.) *Bomarko, Inc. v. Internatl. Telecharge, Inc.*, 794 A.2d 1161, 1178 (Del.Ch.1999), quoting *Cede & Co. v. Technicolor*, 634 A.2d 345, 363 (Del.1993).

**{¶77}** There is sufficient evidence in the present case of such disloyalty, self-dealing, and abdication of responsibility to no longer presume the validity of Patrick Sr.'s actions afforded by the rule. Under Patrick Sr.'s tenure as both president and director, a systemic method of recording transactions in corporate records so as to hide their true nature from the minority shareholder was documented at trial. This continued

after Patrick Sr. spent less time at BFR. "Naturally, the court's 'reluctance to assess the merits of a business decision ends in the face of illicit manipulation of a board's deliberative processes by self-interested corporate fiduciaries.'" *Id.*, quoting *Mills Acquisition Co. v. MacMillan, Inc.*, 559 A.2d 1261, 1279 (Del.1989).

{¶78} Patrick Sr. then attacks the damages awarded in this case, beginning with excessive rent. During trial, Angela's expert, Ickert, was prepared to testify about the fair market rental rate of the property. However, after a challenge to the methodology Ickert used to establish that fair market value was sustained by the trial court, Angela's attorney rephrased his damages evidence by introducing two signed lease agreements. The first called for monthly rent of $12,000, which increased to $13,000 after five years. The second, dated a few months later, required monthly rent payments of $9,000. Ickert quickly figured the difference between the two at $444,000, but then corrected that number after taking into account the $1,000 per month increase after five years, and arrived at a figure of $574,000. Patrick Sr. contends it was error to rely on this testimony that was not included in the expert's report and was not a correct amount of damages. Ickert then opined that BFR was not required to pay any rent, and the jury should consider any amount of rent paid excessive.

{¶79} If the jury had awarded the full amount of all rent payments, an argument could be made that the jury's finding regarding rent would be against the manifest weight of the evidence. However, the jury's decision to use roughly the $444,000 amount (one

third of this is $147,000) when it awarded $144,000 in improper rent payments is supported in the record.

{¶80} Here, the jury determined that the difference in rent from two separate lease agreements was an appropriate amount of damages. That determination is not against the manifest weight of the evidence. The lease calling for $12,000 per month in rent was superseded by a second lease calling for $9,000 per month in rent. These leases were presented to the jury.

{¶81} Further evidence of damages were similarly established at trial. $338,000 in "other damages" were awarded by the jury. While the jury interrogatories included line items for specific improper benefits received by Leneghan family members, the jury appears to have limited those damages to improper salaries of Leneghan employees when it awarded $235,000. It is apparent that the jury considered other items that improperly diverted funds from BFR in the "other damages" category. The jury award of other damages totaling $338,000 is one-third of the total amount of improper payments according to the calculation specified by the trial court. Therefore, the actual amount of improper other payments must be $1,014,000. Evidence exists to support such an amount.

{¶82} Angela adduced evidence establishing the following improper payments: $132,889.47 for three vehicles purchased by BFR but titled to individuals; $372,774.25 for gas credit card charges including charges for diesel fuel when none of the BFR vehicles used diesel; $74,929.54 in cell phone charges; $124,643.36 in company credit

card charges for personal purchases; $9,955 for accounting software that was used by Sean Leneghan in his accounting practice; $104,229 in tuition and related benefits for private schools; $6,800 in sanctions incurred as a result of discovery violations; $111,335.16 in health insurance premiums paid to a company owned by Patrick Sr.; $32,600 for BFR vehicles that were improperly depreciated in tax documents; $46,036 paid to Michael Caruso caused by BFR's failure to pay a deferred compensation agreement.

{¶83} Patrick Sr. and other witnesses had explanations for each of these, but the jury found them incredible. This court agrees with that assessment.

{¶84} The above itemized damages total $1,016,191, one-third of which is $338,730.59. Therefore, the jury's award of $338,000 in other damages is supported in the record.

{¶85} The remitted amount of damages for salaries paid to Leneghan family members totaling $206,776 is also not against the manifest weight of the evidence. Angela's expert testified about reasonable compensation for Leneghan family members and arrived at the conclusion that $620,326 was improperly paid to these individuals. Even Patrick Sr.'s expert testified that for certain years, salaries paid to Leneghan family members were excessive. He also testified that, in the aggregate, these individuals were actually underpaid. However, the expert's evaluation was based solely on unsworn employment surveys filled out by the individuals. In contrast, Angela's expert's evaluation was based on sworn statements and a more thorough evaluation of the facts in

this case. Therefore, the award of $206,776 is also not against the manifest weight of the evidence.

{¶86} Finally, the trial court awarded $4,510 in statutory damages for BFR's and Patrick Sr.'s failure to comply with disclosure requirements under R.C. 1701.37(C).

{¶87} This statute provides:

> Any shareholder of the corporation, upon written demand stating the specific purpose thereof, shall have the right to examine in person or by agent or attorney at any reasonable time and for any reasonable and proper purpose, the articles of the corporation, its regulations, its books and records of account, minutes, and records of shareholders aforesaid, and voting trust agreements, if any, on file with the corporation, and to make copies or extracts thereof. Any written demand by an acquiring person to examine the records of shareholders for the purpose of communicating with shareholders of the issuing public corporation in connection with a meeting of shareholders called pursuant to section 1701.831 of the Revised Code shall be deemed to have been made by a shareholder of the issuing public corporation for a reasonable and proper purpose.

{¶88} Evidence was adduced that on May 4, 2011, Angela made a written request for documents, to which Patrick Sr. never fully responded. A partial response was sent on July 21, 2011. The jury determined that this constituted a breach of statutory duties, and the trial court used May 4, 2011, through the date of trial, July 23, 2012, to assess damages according to R.C. 1701.94(A)(6). The trial court found that, after the five-day waiting period specified in R.C. 1701.37(C) was subtracted, Patrick Sr. was liable for 441 days of noncompliance. Accordingly, the court entered a judgment for $100 plus $10 per day for 441 days. This judgment is not against the manifest weight of the evidence.

{¶89} Appellant's tenth assignment of error is overruled.

### j. Costs

**{¶90}** In his eleventh assignment of error, Patrick Sr. argues that "[i]t was error to award expenses, litigation costs, expert costs, and court costs in Trial 3." The trial court awarded $27,674.27 in litigation costs to Angela. First, the trial court awarded $9,068.80 for video discovery, court reporter fees, and filing fees. The court also awarded $18,336.73 in expert witness fees.[9]

**{¶91}** Civ.R. 54(D) governs the award of costs and provides, "[e]xcept when express provision therefore is made either in a statute or in these rules, costs shall be allowed to the prevailing party unless the court otherwise directs." A decision to award or decline to award costs is within the sound discretion of the trial court. Therefore, such a decision will not be disturbed on appeal absent an abuse of that discretion. *Holmes Cty. Bd. of Commrs. v. McDowell*, 169 Ohio App.3d 120, 2006-Ohio-5017, 862 N.E.2d 136, ¶ 43 (5th Dist.).

**{¶92}** The Ohio Supreme Court has limited what may be considered costs and be awarded to a successful plaintiff. *Centennial Ins. Co. v. Liberty Mut. Ins. Co.*, 69 Ohio St.2d 50, 430 N.E.2d 925 (1982). "Costs are generally defined as the statutory fees to which officers, witnesses, jurors and others are entitled for their services in an action and which the statutes authorize to be taxed and included in the judgment." *Benda v. Fana*, 10 Ohio St.2d 259, 227 N.E.2d 197 (1967), paragraph one of the syllabus. This court has set forth the appropriate evidentiary standard:

---

[9] These two figures equal $27,405.53 when added together, not $27,647.27 as determined by the trial court. However, Patrick Sr. does not argue this point, and this court chooses not to sua sponte recognize this as error.

[T]he prevailing party has the burden of establishing that the expenses it seeks to have taxed as costs are authorized by applicable law. Once the court determines that an allowable cost is established, the burden rests upon the objecting party to overcome the presumption favoring an award of costs to the prevailing party.

(Citations omitted.) *Naples v. Kinczel*, 8th Dist. Cuyahoga No. 89138, 2007-Ohio-4851, ¶ 6.

**{¶93}** The trial court awarded $9,068.80 for video discovery, court reporter fees, and filing fees. The costs for video deposition and use are specifically addressed in Sup.R. 13(D). Sup.R. 13(D)(2) provides, "[t]he reasonable expense of recording testimony on videotape, the expense of playing the videotape recording at trial, and the expense of playing the videotape recording for the purpose of ruling upon objections shall be allocated as costs in the proceeding in accordance with Civil Rule 54." Sup.R. 13(D)(3) further states, "[t]he expense of producing the edited version of the videotape recording shall be costs in the action, provided that the expense of the videotape, as a material, shall be borne by the proponent of the testimony." Based on this rule, the costs of producing, editing, and playing the video-taped depositions of Patrick Sr. are taxable as costs to him in conformity with Civ.R. 54(D).

**{¶94}** Further, the statutes provide another basis to tax certain video deposition expenses as costs. R.C. 2303.21 provides:

When it is necessary in an appeal, or other civil action to procure a transcript of a judgment or proceeding, or exemplification of a record, as evidence in such action or for any other purpose, the expense of procuring such transcript or exemplification shall be taxed in the bill of costs and recovered as in other cases.

The video is an exemplification of a record that may be appropriately taxed as costs.

**{¶95}** The trial court's award of $9,068.80 for video discovery, court reporter fees, and filing fees taxable as costs herein is appropriate because these costs were necessary for litigation and taxable as costs based on statute. Angela additionally sought court reporter fees for depositions and various other proceedings totaling $27,533.25. The trial court did not award those fees.

**{¶96}** The trial court set forth the costs Angela sought in addition to those above: "Plaintiff also submitted invoices seeking reimbursement for other expenses incurred in the litigation, which are not statutorily taxable as costs. These costs are: expert fees $75,421.91; miscellaneous itemized expenses $27.39; copying costs $10,623.28; postage $1,368.83; and delivery charges $789.06."

**{¶97}** The trial court awarded $18,336.73 in expert witness fees. An expert witness fee is not properly charged as costs according to prior holdings of this court as well as the Ohio Supreme Court. *Naples*, 8th Dist. Cuyahoga No. 89138, 2007-Ohio-4851, ¶ 11; *Moore v. Gen. Motors Corp., Terex Div.*, 18 Ohio St.3d 259, 260, 480 N.E.2d 1101 (1985). However, the trial court awarded a portion of the expert witness fee as costs because,

> [t]he Court finds that a portion of the expense for Mr. Ickert's time is appropriately taxed as costs given the conduct of Defendants in attempting to frustrate Plaintiff's expert's review of the financial records of Berardi's. After considering the testimony at trial, the Court finds that approximately twenty-five percent (25%) of Mr. Ickert's time was spent dealing with Defendants' attempts at obfuscation during discovery.

The court then calculated that amount to be $18,336.73. The trial court may have stated it was awarding this amount as costs, but the context makes clear that it is more akin to a discovery sanction based on the improper conduct of Patrick Sr. and his subordinates, which inflated the expert's costs to Angela.

**{¶98}** Many times throughout discovery, Patrick Sr. and other BFR employees denied the existence of electronic business records of BFR, even though such records existed. Civ.R. 37 provides a basis for awarding those increased costs to Angela. These additional costs were only awarded after they were tallied, billing statements were presented, and testimony affirmatively demonstrated that improper actions by Patrick Sr. caused Angela to incur extra costs as a result of the obstructive tactics of the defendants. These additional expenses may also be properly included in an attorney fee award. *Faieta v. World Harvest Church*, 147 Ohio Misc.2d 51, 2008-Ohio-3140, 891 N.E.2d 370, ¶ 156 (C.P.). It was not an abuse of discretion to make Patrick Sr. pay a portion of the expert witness fees that resulted from his discovery abuses.

**{¶99}** In assessing items to be awarded as costs, the trial court relied on this court's analysis in *Jones v. Pierson*, 2 Ohio App.3d 447, 449, 442 N.E.2d 791 (8th Dist.1981). However, this court has since rejected that analysis. *Naples* at ¶ 8, fn. 2.[10] The *Naples* court, in light of *Vance v. Roedersheimer*, 64 Ohio St.3d 552, 597 N.E.2d 153

---

[10] This court and other appellate courts still appear to rely on this holding. *See Sadowski v. Sadowski*, 8th Dist. Cuyahoga No. 88929, 2007-Ohio-5061, ¶ 70; *Kinn v. HCR ManorCare*, 6th Dist. Lucas No. L-13-1016, 2013-Ohio-4085, ¶ 15; *Shoenfelt v. Shoenfelt*, 3d Dist. Shelby No. 17-12-08, 2013-Ohio-1500, ¶ 31.

(1992), determined that an item awarded as costs must have a statutory basis for inclusion. *Id*. at ¶ 8.

{¶100} However, the trial court's reliance on *Jones* was not prejudicial because it declined to award as costs the remainder of the items sought by Angela. The court did not award fees for copying, postage, or any of the items sought by Angela that were not grounded in a statutory basis.

{¶101} The trial court also correctly awarded court costs to Angela. She is the prevailing party, and Civ.R. 54(D) specifically contemplates that court costs typically be awarded to the prevailing party absent a determination by the trial court that such an award is unwarranted. There is a statutory basis for the award of court costs as well. *See* R.C. 2303.20, 2303.21, 2335.19, and 2335 et seq. Patrick Sr.'s eleventh assignment of error argument that this constitutes double billing or was inappropriate is overruled.

### k.   "It was error to allow litigation of issues that occurred after filing the complaint."

{¶102} Civ.R. 15(B) allows for amendment of the pleading to conform to the evidence adduced at trial. It states:

> When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. Failure to amend as provided herein does not affect the result of the trial of these issues. If evidence is objected to at the trial on the ground that it is not within the issues made by the pleadings, the court may allow the pleadings to be amended and shall do so freely when the presentation of the merits of the action will be subserved thereby and the objecting party fails to satisfy the court that the admission of such evidence would prejudice him in

maintaining his action or defense upon the merits. The court may grant a continuance to enable the objecting party to meet such evidence.

{¶103} This court reviews a trial court's decision regarding such amendments for an abuse of discretion. *Aztec Internatl. Foods, Inc. v. Duenas*, 12th Dist. Clermont No. CA2012-01-002, 2013-Ohio-450, ¶ 25. It is at the discretion of the trial court to determine when a party has impliedly agreed to try an issue. However,

> "[a]n implied amendment of the pleadings under Civ. R. 15(B) will not be permitted where it results in substantial prejudice to a party. Various factors to be considered in determining whether the parties impliedly consented to litigate an issue include: whether they recognized that an unpleaded issue entered the case; whether the opposing party had a fair opportunity to address the tendered issue or would offer additional evidence if the case were to be tried on a different theory; and, whether the witnesses were subjected to extensive cross-examination on the issue.

*State (Bainbridge) ex rel. Evans v. Bainbridge Twp. Trustees*, 5 Ohio St.3d 41, 448 N.E.2d 1159 (1983), paragraph one of the syllabus.

{¶104} Patrick Sr. attempts a bit of revisionist history in this twelfth assignment of error. He casts claims that were discovered and added to issues at trial only after disclosure of some transactions and other financial information as if Angela should have known about them from the start. Much of the financial disclosures occurred just before trial and required significant additional work to be presented. Patrick Sr.'s untimely disclosure of evidence resulted in most, if not all, of the complained-of claims. As such, he should not be allowed to benefit from his discovery abuses. There can be no surprise on his part as a result.

{¶105} Further, Patrick Sr. does not point to any specific instance where claims were incorporated to which he had no prior notice, understanding, or a chance to defend. Angela's complaint indicates the actions of Patrick Sr. were ongoing and causing continuing injury. Patrick Sr. filed an unsuccessful motion in limine to exclude actions that occurred after the amended complaint was filed. The trial court denied the motion on June 5, 2012. The amended complaint sufficiently alleged that harms were continuing.

{¶106} Patrick Sr. also claims that the statute of limitations had run out by the time the trial court allowed Angela to amend her complaint to conform to the evidence. However, such an amendment, by Civ.R. 15(C)'s terms, relates back to the original filing of the complaint. "Whenever the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, the amendment relates back to the date of the original pleading." *Id*. The claims made at trial fit within this rule. Any harm that befell Patrick Sr. was the product of his own making.

{¶107} This twelfth assigned error is overruled.

### l. "It was error to deny the motions for JNOV, new trial, and directed verdict after Trial 3."

{¶108} Patrick Sr. does not separately argue his thirteenth assignment of error. App.R. 16(A)(7) instructs a party to include in an appellate brief "[a]n argument containing the contentions of the appellant with respect to each assignment of error presented for review and *the reasons in support of the contentions, with citations to the authorities, statutes, and parts of the record on which appellant relies*." (Emphasis

added.)  Patrick Sr.'s one paragraph argument under this assigned error does none of these emphasized things.  App.R. 12(A)(2) gives this court discretion to disregard or overrule an assigned error that fails to comply with App.R. 16(A).  Therefore, this assignment of error is overruled.

### m. Remittitur

{¶109} Patrick Sr. asserts in his fourteenth assignment of error that "[i]t was error to deny motion for remittitur and motion for new trial in Trial 1."

{¶110} Patrick Sr. takes issue with decisions related to the first trial. Arguments related to this trial are moot as a result of a voluntary settlement. *Sturgill v. JP Morgan Chase & Co.*, 4th Dist. Hocking No. 12CA8, 2013-Ohio-688, ¶ 10.  Therefore, this assigned error will not be addressed and is overruled.

{¶111} Angela also assigns an error related to remittitur based on the trial court's decision to remit the judgment in the third trial.   In her fourth cross-assignment of error, she claims that "[t]he trial court committed reversible error in issuing its remittitur order, where evidence supported the jury's damages finding and where the verdict, there, cannot be deemed excessive."

{¶112} Angela agreed to accept a lower amount of judgment.  Generally, an affirmative assent to trial court actions waives errors related to those decisions as invited error.  However, this is not the case with remittitur.  As the Ohio Supreme Court reasoned,

> [w]hen plaintiff is forced to undergo an appeal by the action of an opposing
> party, after plaintiff has accepted judgment for such reduced damages, it

seems unfair to prevent his having a review of the trial court's determination leading to the reduction in damages, especially if the plaintiff has accepted same only to avoid the delay and expense attending an appeal.

*Wightman v. CONRAIL*, 86 Ohio St.3d 431, 444, 715 N.E.2d 546 (1999). Therefore, Angela's arguments in this assignment of error are not precluded by her assent to remittitur.

> A court has the inherent authority to remit an excessive award, assuming it is not tainted with passion or prejudice, to an amount supported by the weight of the evidence. In *Chester Park v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus, this court set forth the specific criteria that must be met before a court may grant a remittitur: (1) unliquidated damages are assessed by a jury, (2) the verdict is not influenced by passion or prejudice, (3) the award is excessive, and (4) the plaintiff agrees to the reduction in damages.

*Id.*

{¶113} In the present case, the jury awarded unliquidated damages. The damages awarded in this case are not so large or disproportionate that the influence of passion or prejudice can be inferred. *See Chester Park Co. v. Schulte*, 120 Ohio St. 273, 279-280, 166 N.E. 186 (1929). The roughly $28,000 difference between the jury's award and the remitted amount is not indicative of the type of unsupported award influenced by passion or prejudice. However, based on the jury's award of "other damages" and its limiting benefits received by other Leneghan family members to improper compensation, the court correctly found that the award of $235,000 was excessive given the evidence adduced at trial.

{¶114} In ruling on the motion, the trial court stated:

The court finds that the jury's award of $235,000 for improper benefits received by "other Leneghan family members" must be reduced to $206,776. Plaintiff's expert testified at trial that the total excess compensation paid to "other Leneghan family members" was $620,326. One-third of this amount, representing plaintiff's ownership interest in [BFR], equals $206,775.

The court finds that the jury's verdict as to improper rent payments and "other damages" are supported by competent, credible evidence and therefore, are not subject to remission.

{¶115} Angela's expert, Heinz Ickert, testified that the total amount of improper compensation to other Leneghan family members totaled $620,328. Angela is only entitled to one-third of this amount, or $206,776. Yet, the jury awarded her $235,000. In light of the damages received under "other damages," the trial court appropriately reduced the amount of benefits received by other Leneghan family members to reflect the evidence adduced at trial.

{¶116} Further, in her appellee's brief responding to Patrick Sr.'s arguments about remittitur, Angela asserts that "the trial court neither abused its discretion nor committed any reversible error of law in granting appellants' own motion for remittitur with certain modifications of the relief requested therein." Angela appears to make inconsistent arguments to this court regarding remittitur. While this does not outright preclude the argument, it does cut against it.

{¶117} Therefore, the trial court's remittitur order conformed the verdict to the evidence of damages adduced by Angela's expert. This modest reduction was in conformity with the evidence and is not error.

{¶118} This cross-assignment of error is overruled.

## n. Prejudgment Interest

**{¶119}** In her second cross-assignment of error, Angela claims,

[t]he trial court committed reversible error in failing to award appellee prejudgment interest based on its conclusion that appellants did not violate their good faith settlement obligations, despite uncontroverted evidence and the trial court's own express finding that the appellants "failed to cooperate in the discovery process throughout much of this case."

**{¶120}** R.C. 1343.03 allows for the award of prejudgment interest under certain circumstances. R.C. 1343.03(C) provides:

If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case[.]

**{¶121}** This court reviews the trial court's determination for an abuse of discretion. *Pruszynski v. Reeves*, 117 Ohio St.3d 92, 2008-Ohio-510, 881 N.E.2d 1230, ¶ 11. The Ohio Supreme Court further held that

* * * the court may rely in part on its own participation during the pretrial and trial proceedings to aid in its ruling on the motion, *Galmish v. Cicchini* [], 90 Ohio St.3d 22, 34, 2000-Ohio-7, 734 N.E.2d 782, the parties have the right to a date certain for an evidentiary hearing. The trial court, however, has the discretion to determine the nature of the evidentiary hearing to be held, as it is in the best position to select the kind of evidence necessary to make the findings required by R.C. 1343.03(C) and determine whether an award of prejudgment interest is proper.

*Id.* at ¶ 12.

{¶122} The trial court determined that Patrick Sr. and Ballycroy participated in settlement negotiations and made a good-faith effort to resolve the case. The court stated that it could not find that

> defendants failed to make a good faith offer to settle the case. Although the court finds that defendants failed to cooperate in the discovery process throughout much of this case, this lack of cooperation was addressed through discovery sanctions. Defendants otherwise participated in settlement negotiations during both the pretrial and trial phases and tendered reasonable offers of settlement. The court finds that defendants' offers to settle were rationally based on defendant's evaluation of the case, which took into account plaintiff's interest in [BFR] as well as her prior recovery of $6.4 million in damages during the first trial of this consolidated case.

{¶123} Angela claims there were no good-faith settlement negotiations engaged in by Patrick Sr., but she cites mainly to evidence of a failure to cooperate in discovery. In contrast, the evidence adduced at the hearing on prejudgment interest contained lengthy discussions of negotiations that occurred throughout these cases. The fact that Patrick Sr.'s last offer can generously be classified as insulting (made during the middle of trial and offering $260,000 with $10,000 deducted for each day of trial) does not change the nature of the prior discussions. While the offers did not stray too far from Patrick Sr.'s expert's opinion of the value of Angela's stock, this does not demonstrate a lack of settlement efforts.

{¶124} The majority of the evidence offered by Angela related to discovery abuses and obstinate refusals from the defendants to turn over records. However, R.C. 1343.03(C) does not direct the court to weigh a party's conduct related to discovery. It directs the court to consider a party's conduct during settlement negotiations. The court

itself took an active roll in the negotiations and held several conferences attended by Patrick Sr. or a representative. Offers were exchanged and significant movement toward settlement by both parties was noted according to the trial court. The trial court was in the best position to determine if the parties put forth a good-faith effort and, based on the testimony during the hearing, the court did not abuse its discretion.

{¶125} This cross-assignment of error is overruled.

### o.  Contingent assignments of error

{¶126} Angela also assigned a number of errors that contingently requested relief if this court reversed and remanded on any of Patrick Sr.'s assigned errors. Angela advised,

> [i]n the event that this Court rejects those assignments of error and affirms the judgment of the trial court, the only relief requested by the cross-appellant on her appeal is a reversal of the orders regarding punitive damages, prejudgment interest and remittitur, along with a remand for entry of prejudgment interest order and for a retrial on punitive damages. If, on the other hand, this Court vacates the judgment for compensatory damages and remands for a new trial, cross-appellant requests [additional] relief [as outlined in the remaining assignments of error] * * *.

Because this court affirms the outcome of the trial, the following cross-assignments of error will not be addressed:

> III.   In the event that this court is inclined to interpret the limited satisfaction of judgment entry related to David Leneghan and the Wegman Firm as grounds for granting appellant any relief herein, said entry should be vacated as being contrary to law, to the governing settlement agreement, to public policy and in order to prevent an unjust and unintended forfeiture.
>
> V.  The trial court committed reversible error in entering a directed verdict against cross-appellant on her spoliation of evidence claim and in refusing to instruct the jury that, in determining both compensatory and punitive

damages, the jury was entitled to make certain adverse inferences resulting from cross-appellees' destruction, concealment, withholding and/or falsification of discoverable materials and information.

VI. The trial court committed reversible error in dismissing cross-appellant's claim for securities law violations based on its erroneous conclusion that the applicable security was a cognovit note payable to Patrick Leneghan, Sr. and that cross-appellant was not entitled to the protections of the securities laws because she was not a purchaser and had not purchased anything.

VII. The trial court abused its discretion and committed reversible error in making evidentiary, substantive and procedural ruling in the second trial that were of such magnitude and pervasive and so erroneously anti-plaintiff and pro-defense as to deny cross-appellant a fair trial, such that cross-appellant should be granted a new trial with respect to trial number two.

### III. Conclusion

{¶127} Patrick Sr.'s decisions to improperly usurp benefits from BFR to the detriment of its minority shareholder ultimately led to the vindication of those minority shareholder rights. The resultant award of damages from the third trial is not precluded by the one satisfaction rule and does not constitute a double recovery. The judgment awarded in this trial is just and will not be disturbed on appeal.

{¶128} Judgment affirmed.

It is ordered that appellee recover from appellants costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the common pleas court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of

the Rules of Appellate Procedure.


FRANK D. CELEBREZZE, JR., JUDGE

MARY J. BOYLE, A.J., and
EILEEN T. GALLAGHER, J., CONCUR